No. 90-125

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

STATE OF MONTANA,

    Plaintiff and Respondent,

  vs.

JAMES CHARLES OLIVIERI,

    Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
                In and for the County of Cascade,
                The Honorable John M. McCarvel, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            John Keith, Esq., Great Falls, Montana

        For Respondent:

            Hon. Marc Racicot, Attorney General, Helena, Montana
            James Yellowtail, Assistant Attorney General,
              Helena, Montana
            Stephen E. Hagerman, Deputy County Attorney, Great
              Falls, Montana
            Patrick L. Paul, County Attorney, Great Falls, Montana

                         Submitted on Briefs:  August 16, 1990

                                    Decided:  September 6, 1990

Filed:

FILED
'90 SEP 6 AM 11 44
ED SMITH, CLERK
MONTANA SUPREME COURT

_____
            Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

James Charles Olivieri appeals his felony conviction of deliberate homicide, following a jury trial in the Eighth Judicial District, Cascade County. We affirm.

Olivieri raises the following issue:

Did the District Court properly refuse to instruct the jury on the lesser included offense of criminal endangerment, or in the alternative, mitigated deliberate homicide?

During the early morning hours of January 14, 1988, James Charles Olivieri and his life-long friend, Dominic Puliafico, were driving by the Office Club in Great Falls, Montana, when they spotted and picked up a hitchhiker, Ethel Woods. Twenty-one-year-old Ethel was a deaf-mute, who communicated with the two men by writing notes. Shortly after discovering her handicap, Puliafico, indicated to Olivieri that, "this would be perfect," with regard to raping Ethel.

One of the notes Ethel wrote to Olivieri and Puliafico asked if the two men knew of any parties occurring that night. Olivieri and Puliafico responded affirmatively and drove Ethel to their apartment. Outside of the apartment, the three encountered two neighbors and Ray Canto, a friend of Olivieri and Puliafico who had been with the two men earlier in the evening. Following a brief discussion, Olivieri, Puliafico, Ethel and Canto entered the apartment.

2

Shortly after entering the apartment, Olivieri began writing suggestive notes to Ethel, asking her to engage in sexual intercourse. Ethel refused. Puliafico then choked Ethel until she was unconscious. Puliafico and Olivieri proceeded to remove Ethel's clothes. At this point, after Olivieri warned Canto that the upcoming events were going to get serious, Canto chose to leave the apartment.

Puliafico then proceeded to rape and beat Ethel as she slipped in and out of consciousness. Olivieri admitted to holding Ethel's feet while Puliafico raped her, but denied raping or beating Ethel. Instead, Olivieri admitted that during the time Puliafico raped and beat Ethel, he watched the two and laughed.

Thereafter, while the badly beaten Ethel was lying on the floor, Olivieri and Puliafico went into the kitchen and ate macaroni and cheese as they listened to what they believed were Ethel's last breaths of life. Puliafico then raped Ethel for the second time. Following the second rape and to ensure that she was dead, Olivieri and Puliafico took turns striking Ethel on the back of her head with a baseball bat, both men striking her twice.

Olivieri and Puliafico then moved Ethel's nude body into a bedroom. Later that same day, they wrapped Ethel's body in a carpet they obtained from the basement of the apartment. They then weighted the carpet-wrapped body with a cinder block, which they purchased at a local store. That evening, they removed the carpet-wrapped body from the apartment and dumped it in the Missouri

River, hoping that it would be destroyed by the two dams in that area. The carpet-wrapped body, however, was discovered nearly two months later on March 2, 1988. An autopsy revealed that Ethel died of blunt force trauma to her head. Additionally, the autopsy revealed that all of the blunt force trauma Ethel received was inflicted prior to her death.

On March 21, 1989, Olivieri, who had returned to his home state of Massachusetts within a few weeks following Ethel's death, was extradited from Massachusetts to Montana. Puliafico, who had returned to Massachusetts a few months following Ethel's death, was also extradited to Montana. The extradition warrant was based upon information provided by Olivieri's brother, Fred, also of Massachusetts, who telephoned Cascade County officials after Olivieri and Puliafico had, on various occasions, bragged to him in detail about raping and killing a deaf-mute girl in Montana and dumping her body in the Missouri River. Additionally, Olivieri told Fred that it was every man's fantasy to rape and kill a woman.

Olivieri and Puliafico were jointly charged with the offenses of deliberate homicide and obstructing justice. Both codefendants originally pled not guilty to the charges. On May 9, 1989, by an amended information, Puliafico was also charged with the offense of sexual intercourse without consent. On May 9, 1989, Puliafico executed a plea bargain agreement whereby he changed his not guilty plea to guilty to the charge of deliberate homicide and pled guilty to the charge of sexual intercourse without consent--in exchange,

4

the State dropped the charge of obstructing justice. Puliafico was sentenced to 100 years of imprisonment for deliberate homicide and twenty-five years of imprisonment for sexual intercourse without consent, both sentences to run consecutively. Additionally, Puliafico was designated a dangerous offender for parole purposes.

Olivieri, however, maintained his not guilty pleas. His jury trial commenced on October 23, 1989, in Cascade County. During his jury trial, Olivieri neither testified or called a single witness in his defense. The prosecution, however, read Olivieri's legally obtained confession into the record, which was made to Cascade County officials on March 21, 1989.

The District Court instructed the jury on accountability and deliberate homicide, but refused Olivieri's proposed jury instruction upon the lesser included offense of criminal endangerment, or in the alternative, mitigated deliberate homicide. The jury found Olivieri guilty of deliberate homicide and obstructing justice as charged. Olivieri was sentenced to 100 years of imprisonment for deliberate homicide and ten years of imprisonment for obstructing justice, both sentences to run consecutively. Olivieri received an additional ten years of imprisonment under the weapons enhancement statute, also to run consecutively with the above sentences, and was designated a dangerous offender for parole purposes.

The sole issue before this Court is whether the District Court properly refused to instruct the jury on the lesser included offense of criminal endangerment, or in the alternative, mitigated

5

deliberate homicide. Olivieri argues that criminal endangerment and mitigated deliberate homicide are both lesser included offenses of deliberate homicide, and as such, Olivieri was entitled to a lesser included offense instruction. We disagree. Even if Olivieri is correct in asserting that criminal endangerment and mitigated homicide are lesser included offenses of deliberate homicide, evidence must be presented at trial to warrant an instruction on either offense. State v. Heit (Mont. 1990), 791 P.2d 1379, 1382, 47 St.Rep. 919, 922 (citations omitted). Here, Olivieri presented no evidence at trial--he neither testified or called a single witness in his defense.

Moreover, the crime of criminal endangerment is a purposeful or knowing act which causes "a substantial risk of death or serious bodily injury" where deliberate homicide is a purposeful or knowing act which causes death. Sections 45-5-207(1), 45-5-102(1)(a), MCA. A court's refusal to instruct on criminal endangerment is proper when a purposeful or knowing act causes death or when the failure to act results in accountability for deliberate homicide:

> Where "purposely or knowingly" causing a result is an element of an offense, that element can be established if the result involves the same kind of harm or injury as contemplated by the defendant, although the actual degree of injury is greater than intended. See section 45-2-201(2)(b), MCA. Koepplin by his own admissions intended to slap the victim numerous times about the head. The result, death by brain damage, may not have been intended. However, the result that did occur is a more severe form of the same kind of injury that was intended--injury to

6

the head area of the victim. In these instances our deliberate homicide statutes and case law state that the actor may be held accountable for the unintended death, if a causal relationship is established pursuant to section 45-2-201, MCA. . . . a person cannot strike lethal blows and then avoid the consequences of his actions by saying he was surprised his victim dies or that he did not intend to kill her.

State v. Koepplin (1984), 213 Mont. 55, 61-62, 689 P.2d 921, 924.

Regarding causal relationship, § 45-2-201(2), MCA, provides:

If purposely or knowingly causing a result is an element of an offense and the result is not within the contemplation or purpose of the offender, either element can nevertheless be satisfied if:

(a) . . . or

(b) the result involves the same kind of harm or injury as contemplated but the precise harm or injury was different or occurred in a different way . . . .

Here, Olivieri admitted that he intentionally struck Ethel on the back of the head twice with a baseball bat. And, the pathologist who performed Ethel's autopsy testified that Ethel's death was caused by blunt force trauma to the head, and all such injuries were received prior to her death. Therefore, Olivieri's conduct was a causal factor in Ethel Wood's death, pursuant to § 45-2-201(2), MCA, and he is guilty of deliberate homicide.

Olivieri, however, argues that Puliafico alone killed Woods, and no evidence to the contrary was ever presented at his trial. Olivieri's argument is without merit and his attempt to ignore both his own recorded admissions of striking Ethel with a baseball bat

7

and the pathologist's testimony in an effort to reduce his culpability in this brutal crime is of no avail. We hold that the District Court properly refused to instruct the jury on the lesser included offense of criminal endangerment.

Olivieri alternatively argues that he was entitled to have the jury instructed on the lesser included offense of mitigated deliberate homicide. Mitigated deliberate homicide is a lesser included offense of deliberate homicide only if the defendant presents evidence "that he acted under 'extreme mental or emotional stress for which there is reasonable explanation or excuse.'" State v. Heit, 791 P.2d at 1382; § 45-5-103, MCA (citations omitted). Although Olivieri never testified or called a single witness in his defense, he argues that indications of extreme and emotional distress are evident in the record. We again disagree--the record is void of any mitigating factors before, during, or after Ethel's brutal rape and murder. During the time Puliafico raped and beat Ethel, Olivieri admitted that he watched the happenings and laughed. While Ethel laid on the floor unconscious, Olivieri joined Puliafico in the kitchen and proceeded to eat macaroni and cheese. Following the second time Puliafico raped Ethel, Olivieri intentionally struck the badly beaten Ethel with a baseball bat twice. After the crime, Olivieri admitted to feeling that he was just as responsible as Puliafico for Ethel's death. Additionally, Olivieri openly bragged about his involvement to his brother, Fred, on various occasions in Massachusetts, and

told Fred that it was every man's fantasy to rape and kill a woman.

Olivieri now justifies his part in Ethel's death by arguing that he acted only to please and support his life-long friend, Puliafico, and this loyalty to Puliafico should be considered a mitigating factor. Olivieri's argument is without merit. Loyalty to a friend has never been considered a mitigating factor to justify a cold-blooded and savage homicide. The District Court properly refused to instruct the jury on the lesser included offense of mitigated deliberate homicide.

Affirmed.

J. A. Turnage
_____
Chief Justice

We concur:

John C. Sheehy
_____

Diane G. Barz
_____

William E. Hunt
_____

_____
Justices

9