No. 01-056

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 135

STATE OF MONTANA,

        Plaintiff and Respondent,

  v.

KEITH WARREN LONGHORN,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twelfth Judicial District,
In and For the County of Hill,
Honorable John Warner, Judge Presiding

COUNSEL OF RECORD:

      For Appellant:

        Jeremy S. Yellin, Attorney at Law, Fort Benton, Montana

      For Respondents:

        Honorable Mike McGrath; Attorney General; Tammy K. Plubell,
Assistant Attorney General, Helena, Montana

        David Rice, County Attorney, Havre, Montana

            Submitted on Briefs:  December 13, 2001

                   Decided:  June 18, 2002

Filed:

_____
                 Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Keith W. Longhorn (Longhorn) was charged by information in February 1994 with felony sexual assault. A warrant for his arrest was issued, but was not served on Longhorn until six years later. Longhorn filed a motion to dismiss on speedy trial grounds, which the District Court denied. After a jury trial, Longhorn was found guilty of sexual assault. Longhorn then filed a motion for a new trial, wherein he sought to set aside the jury verdict. The District Court denied that motion and sentenced Longhorn to seven years at Montana State Prison, with five years suspended. This appeal followed. We affirm.

¶2 Longhorn raises the following issues on appeal:

¶3 1. Did the District Court err when it denied Longhorn's motion to dismiss for violation of his right to a speedy trial?

¶4 2. Did the District Court err when it denied Longhorn's motion for a new trial?

FACTS AND PROCEDURAL BACKGROUND

¶5 In August 1992, Longhorn and his girlfriend Delaney stayed at the home of T.G. in Havre, Montana. At that time, T.G. was seven years old. Longhorn came to Montana to attend pow-wows, and T.G.'s mother Kathy recalled having a houseful of company at that time because of pow-wows in Fort Belknap and Rocky Boy. The company included Kathy's sister-in-law Toni and Toni's husband Chabon, her brother John and his wife Teresa, and her mother-in-law, Dee.

Toni, Chabon, Longhorn and Delaney all planned to compete in pow-wow dancing.

¶6   The atmosphere at the home at this time was festive.  There was constant activity and the adults frequently stayed up late. According to T.G., she had trouble sleeping on one of these nights, and she laid in the hallway in her pajamas with a sleeping bag and a pillow.  Longhorn went upstairs to use the bathroom and asked T.G. what was wrong.  He told her to go to her bedroom and said he would be there in a minute.

¶7   T.G. returned to her bed.  A few minutes later, Longhorn came into her room and laid next to her on the bed.  There were no lights on in the bedroom.  Longhorn started rubbing T.G.'s stomach, then began rubbing her chest and her vaginal area on top of her pajamas.  Longhorn reached inside T.G.'s pajamas and touched her vagina with his fingers.  Longhorn ultimately inserted one of his fingers into her vagina.  T.G. recalled that one of her siblings, who was asleep in the room, woke up.  Longhorn went to that sibling, patted his or her back, and instructed the child to go back to sleep.  Longhorn then returned to T.G.'s bed and placed his fingers back on her vaginal area.  Longhorn told T.G. this was their "little secret" and nobody else needed to know.

¶8   The next day when T.G. saw Longhorn, he gave her an eerie smile.  She ran away and cried.  Longhorn later left T.G.'s home with her grandmother.  T.G. did not see Longhorn again.

¶9   On January 4, 1994, T.G. confided in her music teacher, Shirlie Hanson (Hanson), that Longhorn had sexually abused her two

3

years earlier. When T.G. told Hanson about the abuse, she was shaking and crying. Hanson testified that T.G. seemed very relieved after her disclosure. After her talk with T.G., Hanson informed the school principal about T.G.'s disclosure. The principal contacted the Havre police. The school counselor, Mark West (West), also offered T.G. support.

¶10 Officer Haberlock, from the Havre Police Department, interviewed T.G. and her parents. T.G. informed Officer Haberlock that the man who assaulted her was staying at the family's home to attend pow-wow and she described the man. T.G.'s parents were able to identify Longhorn as the suspect and told Officer Haberlock that Longhorn had only been at the house on one occasion in August 1992.

¶11 After learning Longhorn's name, Officer Haberlock assembled a photographic lineup for T.G. to review. As soon as he placed the photographs on the table, T.G. selected the photograph of Longhorn and identified him as the perpetrator.

¶12 A warrant for Longhorn's arrest was issued on February 22, 1994. When the Hill County sheriff's office received Longhorn's arrest warrant, an officer entered the warrant into the National Criminal Information Center (NCIC) and sent a teletype message to the sheriff's office in Cleveland County, Oklahoma, requesting a local officer's assistance in finding and arresting Longhorn. Cleveland County, Oklahoma, was Longhorn's last known address.

¶13 Four years later, in March 1998, the Hill County sheriff's office published a request for information of Longhorn's whereabouts in the Havre Daily News "crime stoppers most wanted"

4

section.  The sheriff's office received no information as a result of this effort.  In October 1998 and January 1999, the sheriff's office sent messages to the Cleveland County sheriff's office. Also, in January 1999, a deputy ran a criminal history check on Longhorn to determine if he had any recent arrests that would lead the sheriff's office to his whereabouts.

¶14  On February 22, 2000, Deputy Dwyer received a call from the Cleveland County sheriff's office reporting that Longhorn had been arrested on a domestic assault charge and that Longhorn had been served Montana's warrant.  Deputy Dwyer immediately informed the Cleveland County sheriff's office that Montana would extradite Longhorn.

¶15  A jury trial was held on September 25, 2000, and a guilty verdict was returned on the offense of sexual assault, a felony. The District Court sentenced Longhorn to Montana State Prison for a period of seven years, with the last five years suspended. Longhorn appeals.

## DISCUSSION

¶16  Did the District Court err when it denied Longhorn's motion to dismiss for violation of his right to a speedy trial?

¶17  Whether a defendant has been denied a speedy trial constitutes a question of constitutional law.  We review a district court's interpretation of the law to determine if it is correct.  *City of Billings v. Bruce*, 1998 MT 186, ¶ 18, 290 Mont. 148, ¶ 18, 965 P.2d 866, ¶ 18.

¶18   The Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution guarantee a criminal defendant's right to a speedy trial.   In reviewing a claim that a defendant has been denied a speedy trial, we consider and balance each of the following four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant.  *Barker v. Wingo* (1972), 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117, as applied in *Bruce*, ¶ 19.  Since no single factor is decisive, courts must engage in a difficult and sensitive balancing process.  *Barker*, 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 118.  As discussed in *Bruce*, our analysis of speedy trial claims features both a "straight balancing test" and a "motive test."  *Bruce*, ¶ 54.  As such, the importance of the prejudice factor and the degree of prejudice necessary to establish denial of speedy trial will vary based upon other considerations, such as the length of the delay and the reason for the delay.  *State v. Keyes*, 2000 MT 337, ¶ 17, 303 Mont. 147, ¶ 17, 15 P.3d 443, ¶ 17.  The greater the degree of fault by the State in causing the delay, the less delay or prejudice that need be shown.  However, if the State is not responsible for delay, greater prejudice, and presumably greater delay, would have to be shown.  *Bruce*, ¶ 53.

*Length of Delay*

¶19   We will first consider the length of delay from the time charges are filed until the defendant's trial date for the purpose of determining whether there is a basis for conducting a speedy trial analysis.   This period of time is calculated without assignment of fault to either party for the various periods of

6

delay. *Bruce*, ¶ 55. The necessary length of time to trigger further speedy trial analysis is 200 days. *Bruce*, ¶ 55.

¶20 Here, the Information was filed on February 22, 1994. The trial was held on September 25, 2000. This time period is more than sufficient to trigger further analysis of whether Longhorn was denied his right to a speedy trial.

*Reason for the Delay*

¶21  The second factor requires the court to consider the reasons for the delay.  The court determines which party is responsible for specific periods of time, then respectively allocates the total time delay between the parties.  *State v. Hardaway*, 1998 MT 224, ¶ 15, 290 Mont. 516, ¶ 15, 966 P.2d 125, ¶ 15.

¶22  The right of a defendant to a speedy trial commences when he becomes an accused.  If the accused is out of state, the State must act diligently and in good faith to acquire jurisdiction.  *State v. Robbins* (1985), 218 Mont. 107, 116, 708 P.2d 227, 233-34.

¶23  If the court determines that the State is responsible for 275 or more days of the total delay, the State has the initial burden of demonstrating that the defendant has not been prejudiced by the delay.  *Hardaway*, ¶ 20.

¶24   The District Court separated the delay in this case into two time periods: the period between the issuance of the warrant and Longhorn's arrest, and the period between Longhorn's arrest and the trial.  The court concluded that the arrest warrant was issued on February 22, 1994, and Longhorn was arrested on February 21, 2000.  The court found that the State acted diligently and in good faith in attempting to locate the defendant and did not attribute that time period to the State.  For the second time period, the District Court allocated 99 days of delay to Longhorn for resisting extradition.  The balance of time, from May 31, 2000, until September 26, 2000, was institutional delay.  The court held that

since that time did not exceed 275 days, Longhorn had the burden of proving that he had been prejudiced by the delay.

¶25 Only the time period between issuance of the warrant and Longhorn's arrest is at issue here. Longhorn argues the State breached its duty to make a diligent good faith effort to locate and apprehend him. Specifically, he argues that the court erred when it considered the State's limited resources; when it concluded that it was unreasonable to expect the Hill County sheriff's office to locate him; and when it concluded that the State "wasn't taking a leisurely pace in prosecuting the defendant for their own convenience." Longhorn argues that "[t]he facts, fairness, and the guiding principles revolving around speedy trial analysis preclude blaming a citizen accused for delay when he knew nothing about the charges." He asserts that the court wrongly attributed the six-year delay to him and therefore, the court incorrectly placed the burden on him to prove that he had been prejudiced by the delay.

¶26 The State argues that the Hill County sheriff's office did all that it was able to do to locate Longhorn. At the time the warrant was issued, the only information available to the sheriff's office was Longhorn's last known address, date of birth and social security number. The sheriff's office entered the information on the NCIC system and sent several teletype messages requesting assistance from the sheriff's office in the county of Longhorn's last known address. The State argues that the District Court correctly attributed the pre-arrest time to Longhorn, but that even if this Court disagrees with the District Court's allocation,

Longhorn cannot prevail because he was not prejudiced by the pre-arrest delay.

¶27 Longhorn relies on the United States Supreme Court decision in *Doggett v. United States* (1992), 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520, in arguing that the State was negligent in its efforts to locate him. In *Doggett*, there was a delay of eight and a half years between indictment and arrest. Doggett was indicted in 1980 for conspiring to import and distribute cocaine. The Drug Enforcement Administration (DEA) was the principal agent investigating the conspiracy. In 1981, a DEA agent learned that Doggett had been arrested in Panama and he requested that Panama "expel" Doggett to the United States. Although Panamanian authorities promised to comply when their own proceedings were complete, they freed Doggett the following July and let him go to Columbia, where he stayed with an aunt for several months. In September 1982, he passed through customs in New York City and settled in Virginia. He married, earned a college degree, found a steady job as a computer operations manager and lived openly under his own name. In 1988 the Marshal's Service ran a simple credit check on several thousand people subject to outstanding warrants, and Doggett was found and arrested. *Doggett*, 505 U.S. at 648-50, 112 S.Ct. at 2689-90, 120 L.Ed.2d at 526-27. The district court concluded that the government was negligent in its attempts to locate the defendant, but that "Doggett had made no affirmative showing that the delay had impaired his ability to mount a successful defense or had otherwise prejudiced him." Therefore,

10

the court denied Doggett's motion to dismiss based on denial of a speedy trial. *Doggett*, 505 U.S. at 650, 112 S.Ct. at 2690, 120 L.Ed.2d at 527.

¶28 The United States Supreme Court reversed the lower court's decision, holding that "[w]hen the Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review . . . and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence, nor persuasively rebutted, the defendant is entitled to relief." *Doggett*, 505 U.S. at 658, 112 S.Ct. at 2694, 120 L.Ed.2d at 532 (citations omitted). The Court noted that it reviews trial court determinations of negligence with considerable deference and "[t]he government gives us nothing to gainsay the findings that have come up to us, and we see nothing fatal to them in the record." *Doggett*, 505 U.S. at 652, 112 S.Ct. at 2691, 120 L.Ed.2d at 529. Additionally, the Court stated that, "if the Government had pursued Doggett with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail. Indeed, that conclusion would generally follow as a matter of course however great the delay, so long as Doggett could not show specific prejudice to his defense." *Doggett*, 505 U.S. at 656, 112 S.Ct. at 2693, 120 L.Ed.2d at 531.

¶29 The State points out that there are several factual differences between *Doggett* and this case. We agree. Most significantly, when Doggett returned to the United States and began living in Virginia, he was openly living within the jurisdiction of

11

the DEA. There is nothing in the record to indicate that Longhorn, on the other hand, returned to Montana during the six years between issuance of the warrant and his arrest or was, at any time, within the State's jurisdiction.

¶30 Additionally, the trial court in *Doggett* found that the prosecution had been negligent and the Supreme Court concluded that the finding was not clearly erroneous. In this case, the District Court found that the State made a diligent good faith effort to locate Longhorn. The court found that the State "entered the warrant on the NCIC and sent a message to Oklahoma requesting assistance. The State ran a newspaper advertisement pertaining to locating the defendant on March 12, 1998. On October 4, 1998, a second message was sent to Oklahoma requesting assistance in apprehending the defendant. A third message was sent to Oklahoma on January 28, 1999, again requesting assistance in arresting the defendant."

¶31 We agree with the District Court that the State made a diligent good faith effort to locate Longhorn. Therefore, that time period is allocated to Longhorn, and he has the burden of showing that he was prejudiced by the delay.

### Longhorn's Assertion of His Right

¶32 The State concedes that Longhorn made a timely assertion of his right to a speedy trial.

### Prejudice to Defense

¶33 The fourth factor considers whether Longhorn was prejudiced by the delay. We evaluate prejudice based on the three interests that

12

speedy trials are supposed to protect: (1) prevention of oppressive pretrial incarceration; (2) minimization of the defendant's anxiety and concern; and (3) avoidance of impairment of the defense. *State v. Boese*, 2001 MT 175, ¶ 12, 306 Mont. 169, ¶ 12, 30 P.3d 1092, ¶ 12. The importance of this factor and the degree of prejudice necessary to establish denial of speedy trial will vary based upon other considerations, such as the length of delay and the reason for delay. *Bruce*, ¶ 58. To determine whether Longhorn has sustained his burden of proving prejudice, we address each of the traditional bases for prejudice in turn.

*Pre-Trial Incarceration*

¶34 Longhorn asserts that he was incarcerated for 220 days pre-trial and because he was "incarcerated for a period greater than the time a speedy trial analysis is triggered, [his] incarceration is plainly substantial."

¶35 The State points out that 99 days of Longhorn's incarceration was spent in Oklahoma while he resisted extradition to Montana and that the court released Longhorn on his own recognizance in July 2000, provided that he abide by certain conditions. Longhorn could then not meet the terms of his release and he remained incarcerated until trial.

¶36 Notably, a defendant's right to a speedy trial is not designed to prevent any pre-trial incarceration whatsoever. Rather, the speedy trial right is designed only to prevent oppressive pre-trial incarceration. *State v. Johnson*, 2000 MT 180, ¶ 26, 300 Mont. 367, ¶ 26, 4 P.3d 654, ¶ 26. The proper inquiry, therefore, is whether Longhorn was "*unduly prejudiced* by pre-trial incarceration." *Johnson*, ¶ 26 (emphasis in original).

¶37 Longhorn does not raise any argument that he was prejudiced by his period of pre-trial incarceration. Considering the District Court's willingness to release Longhorn on certain conditions, we conclude that his pre-trial incarceration was not unduly prejudicial.

*Anxiety and Concern*

¶38 Anxiety and concern are an inherent part of being charged with a crime; therefore, the focus of this inquiry is on that anxiety

14

and concern which is aggravated as a result of the delay. *State v. Highpine*, 2000 MT 368, ¶ 28, 303 Mont. 422, ¶ 28, 15 P.3d 938, ¶ 28. During the majority of the delay in this case, Longhorn was unaware that he had a criminal charge pending against him and there is nothing in the record to suggest that he suffered an inordinate amount of anxiety and concern.

*Impairment of Defense*

¶39 Impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown. *Highpine*, ¶ 31 (quoting *Doggett*, 505 U.S. at 655, 112 S.Ct. at 2692-93, 120 L.Ed.2d at 530). This interest of the defendant carries more weight than the other bases for finding prejudice. *Johnson*, ¶ 34.

¶40 Longhorn argues that his defense was impaired by "the loss of possible exculpatory evidence by destruction of documents and deterioration of memory." Specifically, Longhorn argues that school counselor Mark West remembered little if anything about the substance of his meetings with the complaining witness and he destroyed all of his records, including those pertaining to the complaining witness and her discussions about the sexual assault. He cites to our decision in *Bruce* where we stated, "we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove, or for that matter, identify." *Bruce,* ¶ 37. Longhorn argues that the prejudice demonstrated explicitly by West's lack of memory and

15

implicitly by the length of the delay "clearly shows that the District Court erred by not dismissing this case."

¶41 The State notes that upon learning of Longhorn's arrest, it immediately contacted the victim and her mother, who had moved out of state, to make certain they were willing to return to Montana and testify at trial. The State then located the other witnesses who had been named in the Information. The only witness the State was unable to locate was a woman named Delaney, who was Longhorn's girlfriend at the time of the incident. The State asserts that it cooperated in setting up pre-trial interviews of its witnesses for Longhorn's counsel, Longhorn had every opportunity for pre-trial discovery, T.G. clearly recalled the details surrounding the sexual assault, and the teacher who T.G. confided in also clearly recalled T.G.'s report and her emotional state. The State argues that Longhorn's defense was not impaired by the delay "because, other than holding the State to its burden of proof, he had no defense."

¶42 In denying Longhorn's motion to dismiss, the District Court noted that "Defendant has come forward with no real evidence that his defense has been impaired by this delay. There appears to be little, if any, evidence lost by the lapse of time. No exculpatory testimony appears to be missing. The State has contacted all of witnesses listed on the original Information. The alleged victim recalls the incident." Before trial and after deposing West, Longhorn renewed his motion to dismiss and the court again denied the motion, stating "there is no evidence here or no indications that the defendant was prejudiced by that or that there is any

16

indication that Mr. West would have said that the complaining witness was being untruthful."

¶43 We agree with the District Court's analysis. Longhorn has presented no evidence that his defense was impaired by West's lack of memory. As noted by the State, Longhorn's only defense at trial was to hold the State to its burden of proof. West's sketchy memory and the lapse of time actually worked against the State and did not impair Longhorn's defense.

*Balancing Speedy Trial Factors*

¶44 As discussed above, the *Bruce* test requires that we balance all four factors in our analysis of speedy trial issues, and that when there is less fault on the part of the State, greater prejudice need be shown. *Bruce*, ¶ 53.

¶45 We conclude that (1) the length of delay was sufficient to raise the issue; (2) Longhorn asserted his right to a speedy trial; (3) Longhorn bore the burden of proving prejudice; (4) the delay does not weigh heavily against the State; and (5) Longhorn did not prove prejudice. After balancing all four factors, we conclude that the District Court did not err in holding that Longhorn was not denied a speedy trial and we accordingly affirm the District Court order denying Longhorn's motion to dismiss for violation of his right to a speedy trial.

¶46 Did the District Court err when it denied Longhorn's motion for a new trial?

¶47 Section 46-16-702, MCA, permits a defendant to move for a new trial and authorizes a trial court addressing such a motion to

17

modify or change a verdict by finding a defendant not guilty of the offense charged. *State v. Harris*, 1999 MT 115, ¶ 15, 294 Mont. 397, ¶ 15, 983 P.2d 881, ¶ 15. The trial court's decision to grant a new trial or modify or change a verdict must be justified by the law and the weight of the evidence. We review a district court's decision on a motion for a new trial to determine whether the district court abused its discretion. Absent such abuse, we will affirm the district court's decision. *State v. Billedeaux*, 2001 MT 9, ¶ 23, 304 Mont. 89, ¶ 23, 18 P.3d 990, ¶ 23.

¶48 On appeal, Longhorn argues that the District Court erred when it concluded that the State proved beyond a reasonable doubt that the complaining witness was sexually assaulted in August 1992. Specifically, Longhorn argues that the evidence introduced at trial demonstrates that the assault occurred during May or June 1991. He notes that T.G. testified that she has been "'trying to get rid of this out of my mind for the last **nine** years'. . . . the clear implication of this comment is that the alleged sexual assault occurred in 1991." He also points out that several witnesses testified that T.G. said the assault happened after her first grade year, which again was in 1991.

¶49 In its Order denying Longhorn's motion for a new trial, the District Court concluded that "[t]he jury was properly instructed that the incident either happened in August of 1992, or did not happened [sic] at all. . . . [A] reasonable juror could easily find beyond a reasonable doubt that this incident occurred in August of 1992 as alleged. The court looked at the witnesses,

18

heard the evidence and assessed the witnesses' credibility as the jury did. Under the circumstances of this case, the court cannot second guess a jury and say it could not have happened as a matter of law."

¶50 After reviewing the trial transcript, we agree with the District Court that a reasonable juror could have found that the assault occurred in August 1992. Kathy, T.G.'s mother, testified that they had a lot of house guests in August of 1992, that the atmosphere in the house was consistent with what T.G. described, and that she remembered the time period specifically because the family car had broken down that summer on the way to the Fort Belknap pow-wow. Additionally, T.G. testified that the assault happened in the summer of 1992.

¶51 The question of when the assault occurred was a factual question for the jury. There was substantial evidence for the jury to find that the assault occurred in August 1992. We conclude that the District Court did not abuse its discretion in denying Longhorn's motion for a new trial.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ TERRY N. TRIEWEILER
/S/ JIM REGNIER
/S/ JIM RICE

19