No. 05-362

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 125

_____

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

KEITH EUGENE DOYLE,

        Defendant and Appellant.

_____

APPEAL FROM:    District Court of the Second Judicial District,
                     In and for the County of Silver Bow, Cause No. DC 03-110,
                     The Honorable Kurt Krueger, Presiding Judge.

COUNSEL OF RECORD:

       For Appellant:

              Palmer Hoovestal, Hoovestal Law Firm, Helena, Montana
              W. M. Hennessey, Hennessey Law Firm, Butte, Montana

       For Respondent:

              Hon. Mike McGrath, Attorney General; Mark W. Mattioli, Assistant
              Attorney General, Helena, Montana

              Robert McCarthy, County Attorney; Michael W. Clague, Samm Cox and
              Mollie Maffei, Deputy County Attorneys, Butte, Montana

_____

                           Submitted on Briefs:  January 17, 2007

                                 Decided:  May 31, 2007

Filed:

_____
                          Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Keith Eugene Doyle (Doyle) appeals from his conviction in the Second Judicial District, Silver Bow County, of deliberate homicide by accountability. We affirm.

¶2 Doyle presents the following litany of issues for review:

¶3 1. Whether the State of Montana (State) violated Doyle's right to speedy trial.

¶4 2. Whether the District Court violated Doyle's Sixth Amendment right to confrontation by limiting his cross examination of the State's witness.

¶5 3. Whether sufficient credible evidence exists to support Doyle's conviction of deliberate homicide by accountability.

¶6 4. Whether the District Court properly denied Doyle's instruction for lesser included offenses of criminal endangerment and negligent homicide.

¶7 5. Whether the District Court properly instructed the jury on the elements of "purposely" and "knowingly."

¶8 6. Whether the District Court abused its discretion in denying Doyle's motion for mistrial.

## FACTUAL AND PROCEDURAL BACKGROUND

¶9 Richard Solwick (Solwick) was beaten to death inside his Butte apartment on the night of March 3, 2003. The State charged Dean Maestas (Maestas) and Cheren Day (Day) with deliberate homicide, or in the alternative, deliberate homicide by accountability, for Solwick's murder. Law enforcement officers also named Doyle as a third suspect in Solwick's murder. Doyle fled Montana the day after Solwick's death.

He absconded to Washington, Southern California, and Missouri before returning to Butte in late March.

¶10    Butte law enforcement officers arrested Doyle on May 5, 2003. The court set Doyle's bail at $250,000. The State charged Doyle on May 30, 2003, with deliberate homicide, or in the alternative, deliberate homicide by accountability. Maestas and Day pled guilty to deliberate homicide by accountability. They agreed to testify in Doyle's trial in exchange for a lighter sentence. The court set Doyle's jury trial for December 15, 2003. Doyle moved to continue the trial date on November 4, 2003. He also moved the court on May 11, 2004, September 9, 2004, and November 23, 2004, to continue subsequent trial settings. Trial began January 3, 2005.

¶11    Maestas testified that he and Day went to Solwick's apartment on the night of March 3, 2003, in search of Doyle. Maestas admitted that he had been drinking at the Corner Bar, was inebriated, and wanted to fight Doyle because he had heard from Solwick that Doyle had called him a "punk" who could not be trusted. Meastas testified that he knocked on the front door, walked inside, and confronted Doyle about what had been said. A "shoving match" ensued between Doyle and Maestas. Maestas then turned his attack toward Solwick. He punched and kicked Solwick several times. Maestas also held a steak knife to Solwick's throat. The knife left an abrasion on Solwick's neck, but did not cut Solwick's skin. Maestas testified that Doyle became "pretty much upset about the situation" and began beating Solwick with a hammer. Maestas further testified that he did not know if Solwick was alive when he left Solwick's apartment. He went

home, changed clothes, and returned to Solwick's apartment only to find him dead on the living room floor.

¶12　Day provided a similar account. Day testified that she and Maestas left the Corner Bar to confront Doyle. They walked into Solwick's apartment. Doyle and Maestas began to brawl. Day further testified that the attack turned to Solwick because "the whole melee had been started by a lie that [Solwick] said." Day testified that both Maestas and Doyle punched Solwick as he sat in a chair in his living room. Day tipped the chair over and Solwick fell to the ground. Day testified that Solwick grabbed a hammer and that Doyle took it away from him. Day testified that she left the apartment as soon as she saw "a weapon."

¶13　Doyle testified that he and Solwick had been drinking beer at Solwick's apartment when Maestas and Day "barged" through the front door. Doyle stated that Maestas confronted him and Solwick about Doyle having called Maestas a "punk" and that Maestas assaulted Solwick. Doyle testified that he left Solwick in the apartment with Maestas and Day, because he did not want to be around when Maestas was handing out "sucker shots." Doyle spent the night at his sister's house. Doyle testified that he was shocked to learn the next day from his girlfriend, who lives in the apartment downstairs from Solwick, that Solwick had been murdered. Doyle further testified that he fled to Washington and then Southern California, where he considered crossing the border to Mexico. Doyle testified that he realized that the idea was "crazy" as he became more sober. Doyle traveled to Missouri to visit his father. Doyle contacted authorities by

4

phone on three occasions while he was on the run. He provided a statement to detectives on March 27, 2003, following his return to Butte.

¶14 The jury found Doyle guilty of deliberate homicide by accountability. The court sentenced Doyle to 65 years in Montana State Prison. Doyle appeals his conviction.

## DISCUSSION

¶15 *Whether the State violated Doyle's right to a speedy right?*

¶16 Doyle argues that the State violated his right to a speedy trial based on the 598 days that elapsed between his arrest on May 5, 2003, and the beginning of his trial on January 3, 2005. Doyle asserted his right to speedy trial in a motion to dismiss filed two months before the start of trial. The court held a hearing on Doyle's motion. The court allocated four of five delays to Doyle and found that Doyle suffered no prejudice to his defense in light of his request for "numerous continuances."

¶17 Whether a defendant has been denied the right to a speedy trial constitutes a question of law. We review for correctness the district court's legal conclusions on speedy trial. *State v. LaGree*, 2007 MT 65, ¶ 10, 336 Mont. 375, ¶ 10, 154 P.3d 615, ¶ 10. We refuse to disturb the trial court's findings underlying a speedy trial ruling unless such findings are clearly erroneous. *State v. Spang*, 2007 MT 54, ¶ 7, 336 Mont. 184, ¶ 7, 153 P.3d 646, ¶ 7.

¶18 The Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution guarantee a criminal defendant the right to a speedy trial. We analyze speedy trial claims based on the guidelines set forth in *Barker v. Wingo,* 407 U.S. 514, 92 S. Ct. 2182 (1972). We consider the following factors in determining

5

whether a defendant was denied the right to a speedy trial: 1) the length of the delay, 2) the reason for the delay, 3) the defendant's timely assertion of the right to a speedy trial, and 4) the prejudice to the defense caused by the delay. *City of Billings v. Bruce*, 1998 MT 186, ¶ 19, 290 Mont. 148, ¶ 19, 965 P.2d 866, ¶ 19. No single factor controls the speedy trial analysis. We engage in a lengthy and difficult balancing process. *State v. Highpine*, 2000 MT 368, ¶ 14, 303 Mont. 422, ¶ 14, 15 P.3d 938, ¶ 14.

¶19 The first and third factors of Doyle's speedy trial analysis are not at issue. The parties agree that a sufficient number of days had elapsed between Doyle's arrest and the start of trial to trigger further speedy trial analysis. *See Bruce*, ¶ 55 (a delay of 200 days or more between the date that the State filed initial charges and trial triggers further speedy trial analysis regardless of which party caused the delay). The State also concedes that Doyle satisfied the third factor by asserting his right to a speedy trial before trial. Doyle challenges the court's conclusions on the second and fourth factors: the reason for the delay and whether such delay caused prejudice to the defense. We address Doyle's contentions in turn.

*Reason for the Delay*

¶20 Doyle argues that the State should have been held responsible for all 598 days of delay. He contends that the court incorrectly assigned fault to him for four of the five delays based on the fact that he had "moved to continue the trial setting or hearings on five separate occasions." Doyle admits that he sought to continue an omnibus hearing and three trial settings. Doyle contends that no delay occurred as a result of his continuance of the omnibus hearing as the court had not yet set a trial date. Doyle further

6

argues that the State's failure to release crucial evidence in a timely manner forced him to move for the first two continuances for trial. Doyle also blames the State's untimely disclosure of two witnesses for the third trial delay.

¶21    The court allocates the total number of days of delay between the parties for the purpose of determining which party carries the burden of proof under the prejudice factor. *Spang*, ¶ 11. The court determines which party is responsible for specific periods of delay based on the unique facts of each case. *Bruce*, ¶ 56. If the court determines that 275 or more days of delay are attributable to the State, then the State carries the burden to show that the defendant was not prejudiced by the delay. The State's proof includes demonstrating a lack of prejudice based on: 1) the defendant's pretrial incarceration, 2) the defendant's anxiety and concern, and 3) the impairment to the defense. *Spang,* ¶¶ 11-12. The State may shift the burden to demonstrate prejudice caused by the delay back to the defendant if the State can show a lack of prejudice based on one of those factors. The district court then weighs the competing evidence. *Bruce*, ¶ 56.

¶22    The District Court, in assigning fault for the delay, failed to allocate the specific number of days of delay for which the State and Doyle were to be held responsible. The court's skeletal order simply held Doyle responsible for four of the five delays and required Doyle to demonstrate that he suffered prejudice as a result of such delays. The court does not distinguish whether Doyle carried the burden of proof because fewer than 275 days of delay had been attributed to the State or whether the State carried the initial burden of proof and presented enough evidence to shift the burden to Doyle to show prejudice. District courts must allocate correctly the specific number of days of delay

7

between the parties in order to avoid this type of confusion concerning the burden of proof. *See Bruce*, ¶¶ 56-65.

¶23 Regardless of the court's distribution of the burden of proof, however, our review of the record indicates that the State demonstrated at the speedy trial hearing that Doyle suffered no prejudice. The State presented the testimony of two detectives from the Butte-Silver Bow Law Enforcement Agency at Doyle's speedy trial hearing. Detective Butch Harrington testified that he interviewed 22 witnesses while investigating Solwick's murder and that none of the defense witnesses indicated any memory loss as to what happened on the night of the incident. Former Captain of Detectives Jeffrey Miller testified that one witness had died before Doyle's trial and that the witness's death had been detrimental to the State's case.

¶24 Harrington's and Miller's testimony constituted sufficient evidence to satisfy the State's initial burden to demonstrate a lack of prejudice to Doyle based on alleged impairment to his defense--one of the factors enumerated in *Bruce*, ¶ 56. Once the State demonstrates a lack of prejudice to the defendant, the burden shifts to the defense to show that such delay caused prejudice. *Bruce*, ¶ 56. Doyle must demonstrate that the delay prejudiced his defense regardless of whether the court attributed the majority of the delay to Doyle or attributed all of the delay to the State.

*Prejudice to Defense*

¶25 Doyle remained in jail on $250,000 bail since his arrest in May 2003 through his trial in January 2005. Doyle moved the court on three occasions to reduce the bail amount. The court refused to reduce Doyle's bail based on "the gravity of the alleged

8

offense" and the "high probability Defendant will flee." Doyle contends that he suffered significant prejudice as a result of the 21 months of pre-trial incarceration.

¶26 We evaluate prejudice "based on the three interests that speedy trials are supposed to protect: 1) prevention of oppressive pretrial incarceration; 2) minimization of the defendant's anxiety and concern; and 3) avoidance of impairment of the defense." *State v. Longhorn*, 2002 MT 135, ¶ 33, 310 Mont. 172, ¶ 33, 49 P.3d 48, ¶ 33. The degree of prejudice necessary to establish denial of speedy trial depends on other considerations such as the length of delay and the reason for the delay. Less delay or prejudice need be shown with the greater degree of fault attributed to the State for the delay. Conversely, greater delay and prejudice would have to be shown where the delay was not the fault of the State. *Longhorn*, ¶ 18. We address each of the factors for prejudice in turn, keeping in mind that Doyle carries the burden of proof to demonstrate prejudice as discussed in ¶¶ 20-24.

¶27   1. Pretrial Incarceration

¶28 The right to speedy trial is designed to prevent *oppressive* pretrial incarceration, not all pretrial incarceration. *Longhorn*, ¶ 36. (Emphasis added). We must consider, therefore, whether the protracted pretrial incarceration unduly prejudiced the defendant. *Longhorn*, ¶ 36. Doyle points out that he remained "continuously incarcerated since his arrest on May 5, 2003." Doyle cites no legal authority and makes no argument that his pretrial incarceration was oppressive other than to call attention to the fact that he has been confined since the date of his arrest. "'[I]t is not this Court's obligation to conduct legal research on appellant's behalf, to guess as to his precise position, or to develop legal

analysis that may lend support to his position.'" *Pankratz Farms, Inc. v. Pankratz*, 2004 MT 180, ¶ 82, 322 Mont. 133, ¶ 82, 95 P.3d 671, ¶ 82 (quoting *In re Estate of Bayers*, 1999 MT 154, ¶ 19, 295 Mont. 89, ¶ 19, 983 P.2d 339, ¶ 19. We conclude that Doyle failed to establish any prejudice under the first factor, pretrial incarceration.

¶29     2. Anxiety and Concern

¶30     Criminal charges bear a certain amount of inherent anxiety and concern. We must focus, therefore, on the extent that the delay *aggravated* the defendant's anxiety and concern. *Spang*, ¶ 22. (Emphasis added).

¶31     Doyle alleges that he suffered significant anxiety as a result of the "filthy" conditions at the Butte-Silver Bow County Jail. Doyle testified at his speedy trial hearing that the jail served green eggs and undercooked pork that would "make people stink." Doyle further testified that the jail lacked adequate ventilation and that the smell of people "farting" and defecating "on the toilets" while other inmates were watching television would rouse jailhouse fights. Doyle also blames his 40-pound weight gain on the jail's inadequate recreational facilities. We recognize that Doyle understandably may have suffered anxiety and concern during his incarceration at the jail. In the context of a speedy trial claim, however, Doyle must demonstrate that the delay aggravated his level of anxiety and concern. *Spang*, ¶ 22. Doyle presents a catalog of complaints about jail conditions, but makes no argument and presents no evidence that the delay enhanced his level of anxiety and concern.

¶32     Doyle next argues that the jail's failure to provide medical care for his preexisting back injury deepened his anxiety and concern. The record belies Doyle's contentions.

Doyle testified that he received medical care for his ailing back on at least six occasions while being held in the county jail. Medical professionals prescribed medications for Doyle's condition and instructed Doyle on how to perform rehabilitation exercises on his own. Doyle fails to establish any prejudice based on the medical care that he received while in custody.

¶33 Doyle also argues that the delay caused his relationships with his girlfriend, Katerina Bowen (Bowen), and their toddler daughter to deteriorate. Doyle's convictions of domestic abuse and child endangerment in January 2003 undercut his contentions. Doyle admitted that both Bowen and their daughter were victims of the abuse and that part of his criminal sentence included having no contact with them until he completed anger management classes. Doyle testified that he had been "drinking heavy" and "dodging responsibilities." Doyle never completed the anger management classes before his arrest for Solwick's murder. The rift in Doyle's relationships started with his domestic abuse conviction in January and continued with his admitted failure to live up to his responsibilities. Doyle fails to show how the delay aggravated his already failing relationships.

¶34    3. Impairment to the Defense

¶35    Impairment to the defense constitutes the most important factor in the prejudice analysis as it impacts directly the fairness of the trial process. *Spang*, ¶ 12. We focus on evidence issues, witness reliability, and the defendant's ability to prepare a defense in determining whether the delay caused impairment to the defense. *Spang*, ¶ 24.

11

¶36    Doyle asserts that investigators used the delay to pressure Bowen into testifying against him. Bowen made statements to detectives that implicated Doyle in Solwick's murder. Bowen recanted portions of her statement at trial. Bowen testified that she gave the statements voluntarily, but felt pressured by the Department of Family Services (DFS) to make a statement against Doyle in order for her to keep her children at home.

¶37    Even if DFS had pressured Bowen, her testimony gives no indication that the delay actually caused or aggravated such pressures. DFS had been supervising Doyle's and Bowen's family since Doyle's arrest for domestic abuse in January 2003, three months before Solwick's murder. Doyle presented no evidence indicating that the alleged pressure extended by DFS on Bowen to testify against him resulted from the delay.

¶38    Doyle next argues that he suffered impairment to his defense as a result of the delay because one witness had died and two others were unavailable by the time of trial. The State points out that the three unavailable witnesses were listed as witnesses for the State. Doyle ignores the State's argument in his reply brief. Doyle presented no evidence to support his position that these three unavailable witnesses would have aided in his defense.

¶39    We conclude that Doyle fails to establish that the delay prejudiced him under any one of the three interests that a speedy trial is designed to protect. The record shows that Doyle complained about living conditions at the jail that bore no relation to the delay; that Doyle received medical care while in custody of the jail; and that Doyle presented no evidence tending to prove that the delay impaired his defense. The District Court

12

properly denied Doyle's motion to dismiss in light of Doyle's failure to establish prejudice aggravated by the delay.

¶40    *Whether the District Court violated Doyle's Sixth Amendment right to confrontation by limiting cross examination of the State's witness.*

¶41    Doyle asserts that the district court abused its discretion when it denied him the opportunity to question Maestas regarding his criminal history. Doyle moved the court to allow him to cross examine Maestas about his prior convictions after Maestas testified that he lied to authorities, because he was "scared" and that he "never had anything like this happen" to him before.

¶42    Doyle argued in District Court, and makes the same argument on appeal, that Maestas's testimony opened the door to his criminal history as it tended to prove that he had been involved in similar criminal situations, and, therefore, lied on direct examination. Doyle wanted to question Maestas on his convictions for felony theft, felony burglary, and a string of misdemeanor offenses. Doyle also sought to question Maestas about an assault for which he had never been convicted. The court denied the motion after noting that Maestas's criminal history was not relevant in that it did not include convictions for "felony assaults or aggravated assaults or anything of that nature."

¶43    The district court maintains broad discretion in its decision to limit the scope of cross examination. *State v. Beavers*, 1999 MT 260, ¶ 20, 296 Mont. 340, ¶ 20, 987 P.2d 371, ¶ 20. We refuse to overturn the district court's evidentiary rulings absent an abuse of discretion. A court abuses its discretion if it acts arbitrarily or exceeds the bounds of

13

reason resulting in substantial injustice. *State v. English*, 2006 MT 177, ¶ 50, 333 Mont. 23, ¶ 50, 140 P.3d 454, ¶ 50.

¶44     M. R. Evid. 609 prohibits the admissibility of a witness's prior convictions for the purposes of impeachment. We have held, however, that a witness may open the door to past convictions by offering a self-serving statement on direct examination that the court knows to be false. We determined that a witness can be impeached with a prior conviction if the witness fails to tell the truth on direct examination. *State v. Bingham*, 2002 MT 350, ¶ 37, 313 Mont. 376, ¶ 37, 61 P.3d 153, ¶ 37.

¶45     Doyle's argument mischaracterizes Maestas's testimony. The complete transcript demonstrates that Maestas's statement referred to his involvement in Solwick's murder, not his criminal history. The transcript reads as follows:

> Q.   Why were you providing this false information, or that false information?
>
> A.   At that time, I didn't want to be implicated; I was scared. I've never had anything like this happen to me. It's not like this occurs to me, you know, all the time at any time.
>
> Q.   When you say this occurs, what do you mean by this?
>
> A.   I've never had anything like this ever happen to me.
>
> Q.   When you say this, what do you mean by this?
>
> A.   This—such a crime of this—you know—it's just something terrible. I've never seen a dead body. I've never watched somebody be killed, you know.

¶46     Doyle attempted to impeach Maestas on the grounds that his prior convictions show that he lied on direct examination about being in similar situations. Maestas's prior

14

convictions for theft, burglary and other misdemeanor offenses do not undermine his testimony that he has never "seen a dead body" or "watched somebody be killed." M. R. Evid. 609 precludes this kind of impeachment.

¶47 Doyle challenges the constitutionality of M. R. Evid. 609. Doyle asserts that the rule prevented him from confronting his accusers as guaranteed by the Sixth Amendment to the United States Constitution, and Article II, Section 24 or the Montana Constitution. Doyle's asserts that his defense relied on the credibility of the witnesses and that the court's evidentiary rulings robbed him of the opportunity to discredit Maestas in his statement that he "never had anything like this happen."

¶48 We already have determined in ¶ 46 that Doyle's efforts to mine Maestas's criminal history would have been improper under M. R. Evid. 609 in light of the fact that the crimes would not have discredited Maestas's statement. Even if the criminal record tended to discredit Maestas, the evidence would have been inadmissible as cumulative. Doyle razed Maestas's credibility on cross examination by drawing out several inconsistencies between Maestas's testimony at trial and the statements he gave detectives during the investigation. Maestas admitted that he was a liar "at some point." We conclude that the court did not violate Doyle's right to confrontation by limiting his cross examination of Maestas based on M. R. Evid. 609.

¶49 Doyle next argues that the District Court improperly sustained an objection from the State during Doyle's cross examination of Maestas. The relevant portion of the transcript reads as follows:

A: Normally, when I am fighting I swing with both arms, you know, both hands.

Q: Do you fight normally?

The State: Objection.

A: When I have to.

The court: Sustained.

Q: Well, you didn't have to fight on March 4th, 2003, did you?

A: Probably not.

¶50    Doyle argues that he should have been allowed to ask follow-up questions to Maestas's testimony to show that since he normally engages in fights that he was the one who killed Solwick on March 3, 2003.  Evidence of a person's character is generally inadmissible for the purposes of proving action in conformity therewith.  M. R. Evid. 404(a).  Evidence of other crimes, wrongs, or acts, however, may be admissible to prove the character of a person to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  M. R. Evid. 404(b).  Doyle does not offer the character evidence under one of the recognized exceptions.  We conclude that the District Court did not abuse its discretion by sustaining the objection to Doyle's line of questioning.

¶51    Lastly, Doyle argues that the court improperly prevented him from asking Maestas whether the State had been the sole determiner of Maestas's veracity with respect to the plea agreement.  Doyle cites *U.S. v. Schoneberg*, 396 F.3d 1036 (9th Cir. 2005), to support his brief argument that the court's ruling violates his right to confrontation.  The

16

trial court in *Schoneberg* violated the defendant's right to confrontation when it refused to allow cross examination of a co-defendant as to how his plea agreement "might have affected [the co-defendant's] motivation to satisfy the Assistant United States Attorney." *Schoneberg*, 396 F.3d at 1042. The transcript in this case reveals that Doyle cross examined Maestas extensively about the benefits of his plea agreement. The jury had been apprised adequately of the potential biases and motives behind Maestas's testimony in light of Doyle's cross examination. We conclude that the District Court did not violate Doyle's Sixth Amendment right.

¶52 *Whether sufficient credible evidence exists to support Doyle's conviction of deliberate homicide by accountability.*

¶53 Doyle contends that the evidence supporting his conviction does not meet the standard set forth in the court's instruction of the law. The court instructed the jury that a "conviction cannot be had on the testimony of one legally accountable unless it is corroborated by other evidence which in itself and without the aid of the testimony of the person legally accountable, tends to connect the Defendant with the commission of the offense or the circumstances thereof." Doyle argues that the jury's verdict conflicts with the court's instruction, because the decision rests solely on Maestas's and Day's uncorroborated testimony that Doyle killed Solwick. Doyle argues that physical evidence presented by the State only proves that he was present at the crime scene, but fails to connect him to the act of Solwick's murder.

¶54 We review a question on the sufficiency of the evidence to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

17

of fact could have found the essential elements of the crime beyond a reasonable doubt. Circumstantial evidence may be sufficient to sustain a conviction. *State v Mooney*, 2006 MT 121, ¶ 10, 332 Mont. 249, ¶ 10, 137 P.3d 532, ¶ 10.

¶55 In order for the jury to convict Doyle of deliberate homicide by accountability, the jury would have had to conclude that the State met its burden of proof of showing beyond a reasonable doubt that Doyle: 1) had the purpose to promote or facilitate commission of deliberate homicide; and 2) had aided or abetted Maestas and Day in the planning or commission of deliberate homicide. Sections 45-2-301-302, MCA; § 45-5-102, MCA; *State v. Lantis*, 1998 MT 172, ¶ 33, 289 Mont. 480, ¶ 33, 962 P.2d 1169, ¶ 33. The concept of accountability contemplates that the defendant played an active role in facilitating the commission of an offense. *State v. Fish*, 190 Mont. 461, 471, 621 P.2d 1072, 1078 (1980).

¶56 The State presented sufficient evidence independent of Maestas's and Day's testimony that Doyle played an active role in the commission of Solwick's murder. The State introduced gruesome photos showing Solwick's beaten and bloody body. State Medical Examiner Gary Dale (Dr. Dale) testified that Solwick likely died from blunt force trauma and suffered multiple injuries consistent with those likely to occur as a result of repeated blows from a hammer. Dr. Dale also could not rule out asphyxiation as a possible cause of Solwick's death.

¶57 Doyle denied bludgeoning Solwick with a hammer, but admitted that he owned the hammer likely used to kill Solwick. Doyle also denied choking or suffocating Solwick. Bowen and Bowen's sister told investigators, however, that Doyle had admitted

18

to them that he suffocated Solwick. Bowen also told investigators that Doyle told her that he smothered Solwick because he did not want him to "call the cops." An acquaintance of Maestas's, John Dunn (Dunn), corroborated their statements at trial, testifying that Doyle described feeling Solwick take his last breath.

¶58 Other evidence also points to Doyle's guilt. Evidence of Doyle's flight, although inconclusive to prove Doyle's guilt, may have been one of the many circumstances that the jury considered in rendering its verdict. *State v. Davis*, 2000 MT 199, ¶ 40, 300 Mont. 458, ¶ 40, 5 P.3d 547, ¶ 40. In another attempt to throw law enforcement officers off his trail, Doyle told investigators that Maestas had been wearing dark pants and a Starter jacket on the night of Solwick's murder. The State presented a surveillance video from a convenience store that captured Doyle wearing those same clothes just hours before Solwick's murder. Investigators recovered the pants from Dunn's garbage. Analysis at the Montana State Crime Lab revealed that the pants contained both Solwick's blood and Doyle's DNA. We conclude that sufficient evidence supports the jury's finding that Doyle had the purpose to promote or facilitate the commission of deliberate homicide and that Doyle had aided or abetted Maestas and Day in the planning or commission of the offense.

¶59 Doyle next argues that no evidence supports his conviction of deliberate homicide by accountability in light of the fact that the State never obtained a conviction on the underlying offense. Both Maestas and Day pled guilty to deliberate homicide by accountability without admitting that they delivered the fatal blow to Solwick. The jury acquitted Doyle of deliberate homicide in finding him guilty of deliberate homicide by

19

accountability instead. Doyle contends that he cannot be held accountable for an offense that the court never determined to have occurred.

¶60 Section 45-2-303, MCA, provides, and we have long held, that a person may be "convicted for accountability on proof that the offense was committed, even though the other person claimed to have committed the offense has not been convicted or is convicted of a different crime." *State v. Gibbs*, 244 Mont. 251, 258, 797 P.2d 928, 932 (1990). We upheld Gibbs's conviction of trafficking in body parts of game animals through accountability based on § 45-2-303, MCA, even though a jury did not convict her husband of the underlying offense of trafficking. We determined that criminal accountability need not be founded on the convictions from the same crime by the principal offender when "stronger proof" demonstrated that Gibbs had "aided and abetted trafficking." *Gibbs*, 244 Mont. at 258, 797 P.2d at 932.

¶61 Doyle challenges the constitutionality of § 45-2-303, MCA, on grounds that it violates his due process rights under the Fourteenth Amendment to the United States Constitution and Article II, Section 17 of the Montana Constitution. Doyle argues that the statute relieves the State from its burden to prove beyond a reasonable doubt that an offense had been committed, thereby conflicting with due process protections that require convictions to be predicated on "proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970).

¶62 Doyle's argument lacks merit. The plain language of § 45-2-303, MCA, provides that a person may be convicted for accountability only "upon *proof that the offense was*

20

*committed* . . . although the other person claimed to have committed the offense has not been prosecuted or convicted, has been convicted of a different offense, is not amenable to justice, or has been acquitted." (Emphasis added). The statute in no way lessens the State's burden to prove that the underlying offense had been committed. Moreover, the record shows that the State met its burden to show that a deliberate homicide had been committed against Solwick. The State introduced photographs showing that Solwick had been beaten severely. Dr. Dale testified that Solwick likely died as a result of the blunt force trauma that he suffered as a result of these injuries. Dr. Dale also testified that asphyxiation could have been a cause of Solwick's death. This evidence supports the State's proof that a deliberate homicide had occurred. We conclude that Doyle's conviction of deliberate homicide by accountability under § 45-2-303, MCA, does not violate Doyle's due process rights.

¶63 *Whether the District Court properly instructed the jury on the elements of "purposely" and "knowingly."*

¶64 The court read the following instruction to the jury over Doyle's objection: "If purposely or knowingly causing the death of Richard Solwick was not within the contemplation or purpose of the Defendant, either element can nevertheless be established if the result involves the same kind of harm or injury as contemplated but the precise harm or injury was different or occurred in a different way, unless the actual result is too remote or accidental to have a bearing on the Defendant's liability or on the gravity of the offense."

¶65 Doyle argues on appeal that the instruction constituted an improper "*Rothacher*

instruction" that relieves the State of its burden to prove beyond a reasonable doubt the "knowingly" and "purposely" elements of an offense. *See State v. Rothacher*, 272 Mont. 303, 901 P.2d 82 (1995). Doyle also relies on *State v. Lantis*, 1998 MT 172, 289 Mont. 480, 962 P.2d 1169, to support his contention that the "clumsy and confusing" language in the instruction improperly directed the jury to impute Maestas's contemplated result onto Doyle.

¶66 We review jury instructions in a criminal case to determine if they fully and fairly instructed the jury on the law applicable to the case. *State v. Dubois*, 2006 MT 89, ¶ 30, 332 Mont. 44, ¶ 30, 134 P.3d 82, ¶ 30. The district court maintains broad discretion in instructing the jury. We review the court's decision on jury instructions for an abuse of discretion. *State v. Ditton*, 2006 MT 235, ¶ 18, 333 Mont. 483, ¶ 18, 144 P.3d 783, ¶ 18. We will reverse the court only if the jury instruction prejudicially affected the substantial rights of the defendant. *Dubois*, ¶ 30.

¶67 *Rothacher* and *Lantis* confute Doyle's argument. We determined in *Rothacher* that the court's instruction "that the State merely needed to prove that Rothacher acted purposely, without regard to the result that he intended" constituted an improper statement of the law. *Rothacher*, 272 Mont. at 310, 901 P.2d at 86. We deemed the court's error harmless, however, in light of the fact that the court properly instructed the jury based on the statutory provisions of § 45-2-201(2)(b), MCA. *Rothacher*, 272 Mont. at 313, 901 P.2d at 88. The language of Doyle's contested instruction nearly replicates the language of § 45-2-201(2)(b), MCA, and, therefore, properly informed the jury "that the requirement of purposeful and knowing causation [for the offense of deliberate

22

homicide] can occur without intending a specific result, so long as the same type of harm or injury was contemplated." *Rothacher*, 272 Mont. at 313, 901 P.2d at 88.

¶68    We merely recognized in *Lantis* the differences in applying § 45-2-201(2)(b), MCA, to the offenses of deliberate homicide and deliberate homicide by accountability. We determined that the meaning of the term "result" as referenced in the statute constitutes the "death of another human being" when applied to the offense of deliberate homicide. In contrast, the "result" as contemplated by § 45-2-201(2)(b), MCA, in the context of deliberate homicide by accountability means "not the death of another human being, but rather some act designed to promote or facilitate causing the death of another human being." *Lantis*, ¶ 36.

¶69    A reasonable juror could interpret the plain language of the instruction as directing the jury to consider whether Doyle's contemplated "result" included "some act designed to promote or facilitate causing the death of another human being" in the context of deliberate homicide by accountability. *Lantis*, ¶ 36. The court's instruction, therefore, "fully and fairly instructed the jury on the law applicable" to Doyle's case based on *Rothacher*, *Lantis*, and § 45-2-201(2)(b), MCA. *Dubois*, ¶ 30. We conclude that the District Court did not abuse its discretion in instructing the jury based on § 45-2-201(2)(b), MCA.

¶70    *Whether the District Court properly denied Doyle's instruction for lesser included offenses of criminal endangerment and negligent homicide.*

¶71    A defendant is "'entitled to a jury instruction on a lesser included offense when one of the parties requests it and the record contains evidence from which the jury could

23

rationally find the defendant guilty of the lesser included offense and acquit of the greater.'" *Adams v. State*, 2007 MT 35, ¶ 43, 336 Mont. 63, ¶ 43, 153 P.3d 601, ¶ 43, (quoting *Beavers,* ¶ 23). The offense must constitute an included offense of the crime charged in order for the court to instruct the jury on the lesser included offense. *Beavers*, ¶ 23.

¶72 Doyle argues that he introduced sufficient evidence at trial that entitled him to present to the jury instructions on the lesser and included offenses of criminal endangerment and negligent homicide. Doyle offers his testimony that he left Solwick's apartment during Maestas's attack on Solwick, because "he wasn't going to sit there while Maestas started taking sucker shots" as sufficient evidence to warrant instruction on the lesser included offenses.

¶73 Doyle was not entitled to either instruction. Criminal endangerment does not constitute a lesser included offense of deliberate homicide by accountability based on the defendant's failure to act under § 45-2-201(2)(b), MCA. *State v. Olivieri*, 244 Mont. 357, 360, 797 P.2d 937, 939 (1990). The State based Doyle's charge of deliberate homicide by accountability on § 45-2-201(2)(b), MCA. Doyle also presented no evidence at trial supporting an instruction on negligent homicide. Doyle offers no evidence and we can find no evidence in the record that would even suggest that Solwick's murder had been the result of a negligent act. The photographs of Solwick's body plainly reveal that he had been bludgeoned to death. We conclude that the court did not abuse its discretion in refusing to instruct the jury on the lesser included offenses of criminal endangerment and negligent homicide.

24

¶74    *Whether the District Court abused its discretion in denying Doyle's motion for mistrial.*

¶75    Doyle moved for a mistrial after the court ordered jurors to continue deliberating when they were at "an impasse." Doyle contends the court's decision denying his motion constitutes an abuse of discretion, because the court improperly pressured the jury to reach a decision and created the impression that the jury could only return a unanimous verdict rather than a hung jury. He contends that the court failed to explain to the jurors that they should never give up their honest opinion concerning Doyle's guilt or innocence.

¶76    We review a district court's grant or denial of a motion for a mistrial to determine whether the district court abused its discretion. *State v. Steele*, 2004 MT 275, ¶ 15, 323 Mont. 204, ¶ 15, 99 P.3d 210, ¶ 15. Nothing in the record indicates that the court abused its discretion in denying Doyle's motion for mistrial. Contrary to Doyle's argument, the court had instructed the jurors that they should not "surrender an honest opinion as to the weight or effect of the evidence or as to the innocence or guilt of the Defendant because the majority of the jury feels otherwise, or for the purpose of returning a unanimous verdict or to prevent a mistrial."

¶77    The transcript also shows that the court never forced deliberations. The court simply sent the jury home after the jury informed the court that it could not reach a decision on the first day after ten hours of deliberations. The jury resumed deliberations the next morning. The jury sent a second note to the court at the end of the second day of deliberations, informing the court that it was at "an impasse." The court then asked the

25

jurors whether they wanted to go home early or order dinner and continue with deliberations. The jurors chose to break for the day. The jury reconvened on the third day and returned a unanimous verdict convicting Doyle of deliberate homicide by accountability. We conclude that the court did not abuse its discretion in denying Doyle's motion for mistrial.

¶78   We affirm Doyle's conviction.

/S/ BRIAN MORRIS

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ PATRICIA COTTER