FILED

07/25/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0460

DA 15-0460

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 182

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

RUSSELL WAYNE BULLOCK,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC 13-186B
Honorable Mike Salvagni, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Chief Appellate Defender, Koan Mercer, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General, Mardell Ployhar, Assistant
Attorney General, Helena, Montana

            Marty Lambert, Gallatin County Attorney, Eric N. Kitzmiller, Chief
Deputy County Attorney, Bozeman, Montana

Submitted on Briefs:  May 3, 2017

Decided:  July 25, 2017

Filed:

                              Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Russell Wayne Bullock (Bullock) appeals from his jury conviction for sexual intercourse without consent and burglary entered in the Eighteenth Judicial District Court, Gallatin County. With the exception of an incorrectly imposed user surcharge, we affirm Bullock's conviction. Bullock raises the following issues for review:

*1. Whether Bullock was denied his right to speedy trial.*

*2. Whether the court erred when it allowed officers to read out loud from a transcript of Bullock's statements to refresh the witnesses' recollection.*

*3. Whether the jury instruction for burglary, which did not define the elements of theft, should be reviewed under the plain error doctrine.*

*4. Whether the court erred in imposing more than one user surcharge.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 On July 18, 2013, Bullock, who was in his mid-forties, met a group of young men and agreed to purchase alcohol for them. While they were driving, Bullock tickled one of the men, which made the men feel "creep[y]." When Bullock was in the liquor store, the young men concocted a plan to take Bullock out of town and abandon him. Bullock got back in the vehicle and the group drove south of town. There were several versions of what happened next. Bullock contends the young men beat him and left him in a ditch. The young men contend they convinced Bullock to help them look for a rope swing, but denied ever hitting Bullock. Regardless, the group left Bullock.

¶3 Bullock, very intoxicated and disoriented, walked to a nearby house where Amy W. (Amy) lived with her family, including her son, Alex, and eight-year-old daughter, A.W. Amy and her family had been to the county fair that evening and A.W. fell asleep

2

in the car on their drive home. Amy allowed A.W. to continue to sleep in the back seat of the car while parked in the garage. Amy left the lights on in the garage and the door open to the house for A.W. The rest of the family went inside to bed. Amy thought she had closed the overhead garage door, but the door had not closed due to a container being in the way.

¶4 Alex was downstairs and heard A.W. screaming and saying "Ouch" and "stop it." He woke up Amy who told him to go check on A.W. Alex opened the door to the garage and saw a man wearing a shirt by the front of the car, but who was not wearing pants or underwear. The man appeared startled. A.W. came inside with a blanket wrapped around her and Alex locked the door to the garage behind them.

¶5 A.W. was catatonic. She stared blankly at walls, did not pay attention to Alex or Amy, and was unable to say where she was. She was covered in vomit. She had a blood spot in her right eye and was no longer wearing her shorts or underwear. Her clothing was later located on the garage floor. A.W. said little of what happened in the garage. She responded that someone had hurt her and that the man had covered her mouth when she screamed for help. The man told her that the people in the house were asleep and could not help her. During her interview with law enforcement, A.W. offered little information. At trial, A.W. again was unable to give much information. She declined to answer a question about what had happened in the garage, explaining it brought back bad memories and she did not want to talk about it. She affirmed a man she did not know was there, Alex had come to the door, and she went into the house with Alex.

3

¶6    Officers arrived at Amy's house and located Bullock passed out near a trailer in some tall grass. Officers arrested Bullock. Bullock maintained he did not know where he was and that he had been dumped there after being hit in the head with a bottle. Bullock was taken to the hospital and later that night released to Detective Tom Pallach (Detective Pallach). Detective Pallach interviewed Bullock after he was transported to the sheriff's department. During the interview, Bullock, who was on blood thinners at the time, began vomiting blood which prompted law enforcement to take him back to the hospital.

¶7    While at the hospital, Bullock told Detective Pallach that he went into the garage to take the vehicle and that he encountered a female in the garage. He said he had touched her vagina with his hand and he had taken off her clothes. He stated he did not penetrate her or have sex with her. Bullock said he "freaked out" when A.W. told him she was eight years old and he left the garage when someone opened the door to the house. He said that he was hiding out when officers located him.

¶8    The following day, Bullock, still incarcerated, asked to speak to Detective Pallach. Detective Pallach was not working so his supervisor Detective Paul Lewis (Detective Lewis) spoke with Bullock. Bullock asked Detective Lewis about his property and made an unsolicited statement. Bullock told Detective Lewis that he had gone into the garage to see if there were keys for the vehicle and that he was going to drive it to the end of the road. He admitted to touching A.W, but claimed that was all he did. Bullock suggested that his charges should be reduced because he did not penetrate or have sex with A.W.

4

¶9     A.W. was examined by a doctor the night of the incident.  The doctor observed broken blood vessels on multiple parts of A.W's body; redness and swelling in A.W.'s urinary area, in addition to dried blood; and significant redness and an abrasion to A.W.'s hymen.  The doctor explained that the findings were not consistent with a healthy prepubescent girl.  DNA samples were taken from Bullock and A.W.  A partial DNA profile that was consistent with A.W. was developed from Bullock's penis.

¶10    Bullock was arrested on July 19, 2013, and remained incarcerated until trial on February 10, 2015.  The State filed an Information in District Court on August 15, 2013, charging Bullock with sexual intercourse without consent and burglary.  The District Court scheduled an omnibus hearing for September 9, 2013.  Bullock moved to continue the omnibus hearing four times.  The omnibus hearing was eventually set for January 13, 2014.  At the hearing, the District Court set a motions deadline and scheduled trial for July 8, 2014.

¶11    On April 4, 2014, Bullock requested a continuance of the motions deadline for two weeks, explaining that a conflict had occurred which necessitated a change in counsel. Bullock filed a motion to substitute counsel on April 8, 2014.  The District Court subsequently vacated the briefing schedule, but confirmed the trial would remain scheduled for July 8, 2014.

¶12    Bullock then filed a motion to continue the trial date, explaining he needed more time to work with experts.  Bullock also indicated that he was anticipating filing a motion to suppress his statements.  The court granted the motion to continue and set trial for October 6, 2014.  On August 25, 2014, Bullock filed motions to suppress his statements,

to exclude prior bad act evidence, and to depose a potential witness, Kevin Briggs (Briggs). The District Court held a hearing September 19, 2014, and ordered that Bullock could depose Briggs. At the hearing, Bullock indicated that the October 2014 trial date might not be realistic.

¶13 On October 6, 2014, Bullock filed a motion to continue the trial scheduled for October 28, 2014. Bullock argued he needed time because he did not receive information from the crime lab until August, and also because he had not received material regarding five State's witnesses until September 2, 2014. Apparently, the material pertaining to the State's witnesses had been sent to one of Bullock's previous attorneys and not his current counsel.[1] Bullock was not willing to waive his right to speedy trial. The District Court granted the motion and scheduled a new omnibus hearing. At the omnibus hearing, the District Court scheduled the trial for February 10, 2015.

¶14 Bullock filed consolidated motions on December 12, 2014, including a motion to dismiss on the ground his right to a speedy trial had been violated. The District Court held a hearing December 31, 2014, on the speedy trial motion. At the time of the hearing, Bullock still had not interviewed any of the five individuals that were identified in the discovery provided to him almost four months earlier. The District Court denied Bullock's speedy trial motion.

---

[1] A compact disc which included the identity and police interviews of the five witnesses was provided to Bullock's counsel in April 2014. However, due to a clerical error the State sent the disc to Bullock's previous counsel. The error was not rectified until September 2014.

6

**STANDARDS OF REVIEW**

¶15 We review the district court's factual findings on a speedy trial motion to determine whether they are clearly erroneous. We review the court's balancing of the four speedy trial factors de novo to determine whether there has been a violation of the defendant's constitutional right. *State v. Ariegwe*, 2007 MT 204, ¶ 119, 338 Mont. 442, 167 P.3d 815. We review evidentiary rulings for an abuse of discretion; however, where the trial court's ruling is based upon an interpretation of an evidentiary rule, this Court's review is de novo. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P. 3d 811. Finally, we have consistently held that we will not consider issues raised for the first time on appeal. *State v. Taylor*, 2010 MT 94, ¶ 12, 356 Mont. 167, 231 P.3d 79. However, the Court may review an unpreserved claim alleging a violation of a fundamental constitutional right under the plain error doctrine where the defendant establishes that failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. *Taylor*, ¶¶ 12-13. An error is plain only if it leaves one "firmly convinced" that some aspect of the trial, if not addressed, would result in a manifest miscarriage of justice, call into question the fairness of the trial or proceeding, or compromise the integrity of the judicial process. *Taylor*, ¶ 17.

**DISSCUSSION**

¶16 *1. Whether Bullock was denied his right to speedy trial.*

¶17 We consider four factors in a speedy trial analysis: (1) the length of the delay, (2) the reasons for the delay, (3) the accused's response to the delay, and (4) prejudice to the

accused as a result of the delay. *Ariegwe*, ¶ 13. We then balance the factors to determine if a speedy trial violation has occurred. *Ariegwe*, ¶ 101. All factors must be considered together with any other relevant factors; no single factor is dispositive. *Ariegwe*, ¶ 112. The significance of each factor will vary from case to case. *Ariegwe*, ¶ 105.

¶18 It is uncontested that the total length of delay was 571 days, which is 371 days past the initial 200-day threshold. The further the delay stretches past the 200-day threshold, the stronger the presumption of prejudice. *Ariegwe*, ¶¶ 49, 61. Here, the length of the delay stretches well beyond the 200-day threshold, creating a presumption of prejudice which intensifies as the delay continues.

¶19 Under the second factor we attribute each period of the delay to the appropriate party and assign weight to the period based on the reason for the delay. *Ariegwe*, ¶ 108. The State is assigned the delay unless the delay was caused by the accused. *Ariegwe*, ¶ 108. Delay caused by the State's bad faith weighs heavily against it. *Ariegwe*, ¶ 67. Institutional delay and valid reasons for delay weigh less heavily against the State than lack of diligence in bringing the accused to trial. *Ariegwe*, ¶ 108.

¶20 Bullock was arrested July 19, 2013. At Bullock's initial appearance on August 19, 2013, an omnibus hearing was scheduled for September 9, 2013. The interval from Bullock's arrest on July 19, 2013, to September 9, 2013 (52 days), is attributable to the State as institutional delay. At the omnibus hearing on September 9, 2013, Bullock moved to continue the hearing, as well as the next four omnibus hearings. As a direct result of Bullock's motions to continue the omnibus hearings, no trial date was scheduled until January 13, 2014, at which time the first jury trial setting available was July 8, 2014.

The delay from September 9, 2013, to January 13, 2014 (126 days), is attributable to Bullock to accommodate his requests to continue the omnibus hearings. The delay from January 13, 2014, to July 8, 2014 (176 days), is a result of the busy docket of the court and constitutes institutional delay.

¶21 On June 12, 2014, Bullock moved to continue the July 8, 2014 jury trial date and a second jury trial setting was scheduled for October 28, 2014. The delay from the first jury trial setting on July 8, 2014, to the second jury trial setting on October 28, 2014 (112 days), is a result of a number of factors. On April 8, 2014, there was a change of counsel for Bullock and new counsel needed additional time to become familiar with the case. In Bullock's motion requesting a continuance, Bullock's counsel represented that he would be requesting additional discovery from the State Crime Lab regarding DNA collection and processing, which he did on July 28, 2014. The information from the State Crime Lab was provided to Bullock on August 15, 2014. There is no testimony or evidence that the State delayed providing discovery to gain an advantage in this case. The jury trial was continued at the request of Bullock's counsel. This type of delay was addressed in *Ariegwe* as delay that is inherent in the criminal justice system due to reciprocal discovery and pretrial motions. *Ariegwe*, ¶ 125. The circumstances surrounding this delay demonstrate that it is institutional in nature.

¶22 On October 6, 2014, Bullock requested another continuance of trial, which was scheduled for October 28, 2014, which was then rescheduled for February 10, 2015. This resulted in a delay of 105 days and arose out of the discovery issues surrounding the five witnesses. The District Court observed that although all the information concerning the

9

whereabouts of the witnesses was not known, Bullock had not yet interviewed any of them as of December 31, 2014. The District Court found, and we agree, that there was no evidence the State failed to provide discovery, nor did the State intentionally withhold information from Bullock. The State's efforts were more than adequate, and the District Court's finding the delay was institutional was not clearly erroneous.

¶23 Under the third factor, we consider the totality of the accused's responses to ascertain whether the accused actually wanted a speedy trial. *Ariegwe*, ¶ 74. As long as the defendant has asserted his or her right by motion to dismiss on speedy trial grounds prior to trial, we will find that the defendant has satisfied the third prong. *Ariegwe*, ¶ 137. Here, Bullock asserted his right to speedy trial on December 21, 2014. The District Court concluded that Bullock satisfied the third prong of the speedy trial analysis. We agree.

¶24 Under factor four, we consider whether the delay prejudiced the accused in light of the interests the speedy trial right was designed to protect: (i) oppressive pretrial incarceration, (ii) the accused's anxiety and concern, and (iii) impairment of the defense. *Ariegwe*, ¶ 88. Bullock argues that he suffered from each. Bullock maintains his pretrial incarceration was oppressive due to his medical conditions. Bullock has a plethora of medical issues. He requires pulmonary medication, sleep medication, pain medication, and he suffers from sleep apnea. Bullock maintains that he was denied the use of medical equipment for his sleep apnea, as well as his medication. At the hearing, however, Nurse Stephanie Catron (Nurse Catron), who provided Bullock's care during his incarceration, testified Bullock was provided all of his current medications and that he also received all the medication he requested, with the exception of sleep medication which cannot be

10

dispensed for safety reasons. She further testified that Bullock did not appear stressed or anxious, nor did he complain about the level of care he was receiving. Based upon Nurse Catron's testimony, we cannot find the District Court's conclusion that Bullock's pretrial incarceration was not oppressive to be clearly erroneous.

¶25 A certain amount of anxiety and concern is inherent in being accused of a crime; the speedy trial guarantee is designed to shorten the disruption of the accused's life, not to eliminate it altogether. *Ariegwe*, ¶ 97. Bullock is a single father of two young girls. While incarcerated he was unable to parent his children. Bullock's 13-year career in auto sales was also disrupted. While we do consider loss of employment and interruption of family associations as a factor when determining the accused's anxiety and concern, we cannot find that Bullock's disruption to his career or loss of opportunity to parent caused his anxiety or concern to rise above what is to be expected of a normal detainment for a felony sexual offense. The District Court's finding the pretrial delay was not unduly prolonged or disruptive is not clearly erroneous.

¶26 The most important interest when conducting the prejudice analysis is whether there was impairment to the defense. *Areigwe*, ¶ 98. Bullock does not point to any specific aspects of his defense that were compromised, although he is nonetheless entitled to a presumption of increasing prejudice as the delay intensifies. Bullock cites the issues regarding DNA evidence and locating the five witnesses as causing injury to his defense. However, any delays from these circumstances arose as a result of Bullock's requests for continuances in order to prepare for his defense. Examples supporting impairment to the defense include missing exculpatory witnesses, loss of memory, and loss of evidence.

11

*Ariegwe*, ¶ 98. The record supports that Bullock's counsel would not have been prepared for trial any sooner. The District Court's conclusion that there was no impairment to the defense is not clearly erroneous.

¶27 Finally, we conclude the District Court did not err in balancing these four factors. The charges in this case were serious and involved a number of witnesses, complex DNA evidence, and multiple substitutions of counsel. Given the complexity of the case and the reasons for the delay, the District Court balanced the factors and correctly determined that Bullock's right to speedy trial was not violated.

¶28 *2. Whether the court erred when it allowed officers to read out loud from a transcript of Bullock's statements to refresh the witnesses' recollection.*

¶29 Bullock argues that Detectives Lewis and Pallach were improperly allowed to read portions of the transcript of Bullock's statements to the jury. Bullock argues that the witnesses should not have read from the transcript to the jury and that the procedure for refreshing the witnesses' recollection allowed the jury to hear inadmissible evidence. Bullock also argues that the transcripts were inadmissible hearsay because they were the statements of the transcriptionist, rather than of Bullock.

¶30 First, Bullock's statements evidenced by the transcripts were admissions of a party opponent and are not hearsay pursuant to M. R. Evid. 801(d)(2). Additionally, Bullock has provided no support for his contention that the statements in the transcript were not an accurate representation of what Bullock said. The statements were produced from recordings of Bullock's interviews. We observe that Bullock's trial counsel also relied on the transcripts and did not contend the transcripts were inaccurate. Both witnesses

12

testified they recalled their interviews with Bullock and that their memories were, in fact, refreshed. We conclude that the District Court correctly overruled Bullock's hearsay objection.

¶31    We also conclude that because the statements were admissible as admissions of a party opponent pursuant to M. R. Evid. 801(d)(2), that the court did not abuse its discretion in allowing the witnesses to read from the transcript to the jury. We recognize that while M. R. Evid. 612 provides that a witness may use a writing to refresh his or her memory while testifying, the Rule does not provide that the writing itself may be admitted, through testimony or otherwise. M. R. Evid. 612 allows for "a witness [to] use[] a writing to refresh memory for the purposes of testifying . . . ." The Commission Comments to M. R. Evid. 612 explain:

> A writing used to refresh memory is one that is meant to help a witness who has a memory of the subject of his testimony, but who needs a stimulus in order that his memory be revived. The witness can testify independently of the writing, and it is his memory or recollection which is used as evidence and not the writing.

Accordingly, the writing is only to be used as a tool to refresh the witness's recollection about a particular event. If the witness's recollection is not refreshed, then he or she has no personal knowledge from which to testify.

¶32    Bullock is correct that the verbatim recitation of the transcript to the jury was not an appropriate method of refreshing the witnesses' testimony under M. R. Evid. 612. Although the adverse party is entitled to introduce relevant portions of the writing into evidence to impeach the witnesses' testimony, the rule does not allow the proponent of the evidence to have the refreshed witness read verbatim to the jury the contents of the

13

writing. However, once again, we find that to the extent there may have been error in allowing the witness to read the transcript out loud, the error is not grounds for reversal. The statements Bullock made to the officers were otherwise admissible as admissions by a party opponent. Additionally, the record does not establish that the witnesses were not testifying from their refreshed recollections. *See* § 46-20-701, MCA ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded. . . . ").

¶33 *3. Whether the jury instruction for burglary, which did not define the elements of theft, should be reviewed under the plain error doctrine.*

¶34 The District Court instructed the jury on the elements of burglary; specifically, that the State had to prove Bullock intended on committing a theft (taking the vehicle) when he broke in and entered the garage of Amy's home. The District Court did not instruct the jury on the elements of theft.

¶35 We have consistently held that we will not consider issues raised for the first time on appeal. *Taylor*, ¶ 12. Bullock did not object to the jury instructions given at trial, nor did he propose his own alternative jury instructions. Bullock's own statements were that he planned to borrow the vehicle to drive it to the end of the road and leave it. In order to address the alleged error, we would have to exercise plain error review. Under the facts of this case, the court's failure to instruct the jury on the elements of theft does not warrant plain error review. Here, we conclude that failing to address the alleged error would not result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial, or compromise the integrity of the judicial process. We

14

therefore decline to address the alleged error because it was not properly preserved for review.

¶36    *4. Whether the court erred in imposing more than one user surcharge.*

¶37    The State concedes the imposition of the court information technology user surcharge per count and not per user is illegal under § 3-1-317(a), MCA. The statute authorizes all courts to impose "on *a defendant* in criminal cases, a $10 *user* surcharge upon conviction for any conduct made criminal by state statute . . . ." Section 3-1-317(1)(a), MCA (emphasis added). We recently held "the surcharge is authorized per user upon conviction, and not per conviction of that user." *State v. Pope*, 2017 MT 12, ¶ 32, 386 Mont. 194, 387 P.3d 870. The District Court erred when it imposed the court technology fees on a per count basis.

## CONCLUSION

¶38    We affirm Bullock's convictions for sexual intercourse without consent and burglary. We remand to the District Court with instructions to strike the user surcharge and impose only one $10 user surcharge.

/S/ LAURIE McKINNON

We Concur:

/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ JIM RICE