FILED

02/24/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0584

DA 23-0584

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2026 MT 30

---

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

WILLIE ANTOINE REDD,

      Defendant and Appellant.

---

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 21-218
Honorable Brett D. Linneweber, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Rufus I. Peace, Peace Law Group, LLC, Jacksonville, Florida

      For Appellee:

          Austin Knudsen, Montana Attorney General, Mardell Ployhar,
Assistant Attorney General, Helena, Montana

          Scott D. Twito, Yellowstone County Attorney, Jacob Yerger, Arrielle
Dean, Deputy County Attorneys, Billings, Montana

---

      Submitted on Briefs:  November 13, 2025

      Decided:  February 24, 2026

Filed:

_____
          Clerk

Chief Justice Cory J. Swanson delivered the Opinion of the Court.

¶1 Willie Antoine Redd appeals a conviction in the Thirteenth Judicial District Court, Yellowstone County. Following a jury trial, Redd was found guilty of Aggravated Assault after Redd assaulted his girlfriend's three-year-old daughter, causing serious injuries. The court sentenced Redd to twenty years in Montana State Prison (MSP) and ordered $53,934.97 in restitution. We affirm.

¶2 We restate the issues on appeal as follows:

*Issue One: Whether the District Court erred in denying Redd's motion to dismiss alleging a violation of the Interstate Agreement on Detainers.*

*Issue Two: Whether Redd's initial appearance was held without unnecessary delay.*

*Issue Three: Whether the District Court erred in denying Redd's motion to dismiss alleging a violation of his right to a speedy trial.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On February 2, 2021, Redd was supervising his girlfriend T.M.'s three-year-old daughter, A.F., while T.M. was working. Late in the evening, he called T.M. and told her he had spanked A.F. Around midnight, Redd called T.M. again and told her A.F.'s lip was busted open because his car had been shot at, and he fled at high speed while A.F. was unrestrained. After seeing A.F.'s injuries, T.M. stated A.F. needed to go to the hospital but Redd insisted A.F. was fine.

¶4 Around 4:30 a.m., T.M. took A.F. to the hospital. When A.F. arrived at the hospital, she had bruises across her body and low blood pressure, indicating she was suffering from internal bleeding. A.F. was lethargic and did not respond properly. She had "Battle" sign

2

bruising, or bruising behind the ear, which are indications of a skull fracture or an intercranial injury. After receiving a blood transfusion, which stabilized her blood pressure, A.F. was given a CT scan, which showed bleeding in her brain. Due to the severity of the injuries, A.F. was immediately transferred to a hospital in Denver specializing in pediatric neurology. A.F. was diagnosed with a subdural hematoma and lacerations of the liver, spleen, and kidney.

¶5 Redd stated to law enforcement officers someone had shot at him while he was in the car with A.F., and she was injured when he fled at high speed while she was unrestrained. Upon investigation, law enforcement determined Redd had shot at his own car.

¶6 On February 17, 2021, before Redd was charged by the State of Montana, he was arrested for violating his supervised release in the U.S. District Court for the District of Montana, Billings Division. Redd was booked into Yellowstone County Detention Facility (YCDF), a state-run facility, under the custody and control of the United States Department of Justice.

¶7 On February 18, 2021, the State filed an Information, charging Redd with aggravated assault. The same day, the Yellowstone County District Court issued an arrest warrant for Redd. The next day, the State petitioned for a writ of habeas corpus *ad prosequendum* directing federal authorities to bring Redd before the District Court so he could appear for arraignment. The court issued the writ on February 22, 2021.

¶8 Redd remained in federal custody until May 20, 2021, when the United States District Court revoked his federal sentence and sentenced him to 12 months in prison. The

3

same day, the United States Marshal issued an Order to Produce directing the YCDF to deliver Redd to the custody of Yellowstone County pursuant to the writ, and the State served Redd with the arrest warrant.

¶9 The arraignment was held on May 24, 2021. A defense attorney was present but was not assigned to Redd's case. The court ordered the State Office of Public Defender (OPD) to appoint counsel for Redd, and scheduled the omnibus hearing for July 26, and the trial for October 25, 2021.

¶10 The public defender was appointed and filed a notice of appearance on July 6, 2021. The omnibus hearing was not held on the scheduled date, and the court held a status conference on October 15, 2021. Redd's counsel requested a continuance and a scheduling conference.[1] Counsel explained he was under the impression the State lost jurisdiction to the federal court, and he had not visited Redd, but he would do so soon. Redd was present at the meeting and stated to the court he attempted to contact his lawyer numerous times, but his lawyer had not returned any of the mail he sent or filed any motions Redd requested. The court instructed Redd to let the court know very specifically if he wanted a hearing on his representation. Redd did not request a hearing.

¶11 The District Court held the next status hearing on November 24, 2021. The county attorney advised the court he sent an omnibus form to Redd's counsel in July, who completed his portion of the form, but the forms were not filed. Redd indicated displeasure with his counsel for not informing him he had received the forms. Redd's counsel

---

[1] Prior to the hearing, Redd sent a "kite," or a message using a standard jail communication form, to his public defender, indicating he "opposed any motion for continuance."

4

suggested holding the omnibus hearing that day, but Redd objected because he wanted time to consult with counsel. The court set the omnibus hearing for December 1 and informed counsel the trial needed to be scheduled. Redd again expressed his displeasure with his representation, and the court informed Redd that substituting his attorney would likely push back the timing of the trials "at least a couple of months, probably more than that." The court also informed Redd "the timeframe from the motion until a new trial date, if that were to happen, has a great likelihood of not being counted on any speedy trial motion time against the State." The court instructed Redd to speak to his counsel about the ramifications of any motion on the trial date and the Speedy Trial Act.

¶12 On December 1, 2021, Redd requested a substitution of counsel. The court informed Redd obtaining a "conflict attorney"—a court appointed attorney who works in private practice and not for the Public Defender's office—can be "a time-consuming proposition." Additionally, new counsel would have to become acquainted with the case, which "would result in a delay of at least several months[,]" and that delay would be attributed to Redd. Redd accused his counsel of not being truthful to him or the court, stating he sent multiple "kites" and attempted to reach him by phone, and counsel still failed to communicate with him until the October 15 status conference. The court asked Redd if he was willing to accept that substituting counsel would "delay any new trial setting for several months," to which Redd replied "Yes." The court granted the substitution of counsel.

¶13 During a status hearing on January 24, 2022, OPD informed the court that "given the nature of the offense and [Redd's] history, [OPD is] struggling to find someone who's

able to take [the case] on at this time," and OPD was looking for out-of-county contractors or public defenders from other regions of the state.

¶14    On February 1, 2022, attorney Amanda Gordon filed a notice of appearance. However, Gordon was not present at the February 7 status hearing, so the hearing was reset for March 7. The court informed Redd "[Ms. Gordon is] a very good attorney" and the court "know[s] her."[2] The court also scheduled a trial status hearing for April 1 and the trial for April 11, 2022.

¶15    At a March 7, 2022 status hearing, Gordon said she was ready to schedule the omnibus hearing. The hearing was held on March 17. The court granted Gordon's request for additional time to file pretrial motions.

¶16    During a status hearing on April 1, 2022, Redd moved for continuance, and the court granted the motion, resetting trial for May 9, 2022. On April 7, 2022, Redd filed a motion to dismiss, arguing dismissal was required under the Interstate Agreement on Detainers (IAD) because the State's writ of habeas corpus *ad prosequendum* triggered the statutorily mandated 120-day time limit for commencement of trial. Redd argued he was in the State's custody on February 22, the day the court issued the writ. Because the trial was originally set for October 25, 2021, this violated the IAD.

¶17    The State responded, arguing that the IAD does not apply because the writ is not considered a detainer. In the alternative, the State argued Redd implicitly waived his IAD argument by agreeing to the trial date and subsequently requesting new counsel.

---

[2] Gordon was later disbarred for an unrelated matter. *In re Gordon*, No. PR 25-0553, (Mont. Dec. 23, 2025).

¶18     At an April 29, 2022 status hearing, the court set a motions hearing for May 4, and trial for May 23, 2022.   Redd had not yet filed a reply brief.

¶19     Before the motions hearing, Gordon contacted the State and the court advising them of a personal emergency preventing her from appearing at the hearing and preparing for the May 23, 2022 trial.  On June 23, Gordon was able to confirm her availability for the trial and the trial was reset for October 24, 2022.

¶20     Redd filed his reply in support of his motion to dismiss on July 6, 2022.  The hearing on the motion took place the same day.   On August 25, 2022, the court issued an order denying Redd's motion to dismiss, holding a "probation-violation detainer" does not meet the IAD's detainer definition, a writ of habeas corpus *ad prosequendum* is not a detainer governed by the IAD, and Redd did not "properly invoke[] the procedural mechanisms of Article III" of the IAD.

¶21     On September 19, 2022, the State filed a motion requesting a status hearing to address various issues related to ongoing trial preparations.  On September 27, 2022, the court held the hearing.  Redd presented no issues with counsel (including discovery) or the trial setting.  Gordon's co-counsel Jay Reno entered his notice of appearance.

¶22     On October 3, 2022, Robert Stephens filed a notice of appearance and discovery demand on behalf of Redd.  Gordon immediately filed a motion to withdraw herself and Reno as counsel.  The State opposed Gordon's motion and moved for a status of counsel hearing.  On October 4, 2022, the court held a status of counsel hearing.  The court granted Gordon's motion to withdraw as counsel.   Stephens requested a continuance of the October 24 trial date, explaining he needed to conduct a case evaluation.  The court granted

this request and ordered the parties to appear for a scheduling conference on October 24, 2022, to discuss a new trial date. During the October 4 hearing, Redd waived his right to speedy trial for the delay between the October 24 trial date and the date of the new trial.

¶23 On October 7, 2022, Redd moved to dismiss the case for violation of the right to a speedy trial. On October 24, 2022, the court held an omnibus and status hearing and set the trial for March 8, 2023. On October 25, Redd filed a motion to dismiss for delay of initial appearance. On November 4, Redd filed an alternative motion to suppress evidence. A motions hearing was held on December 16, 2022.

¶24 On February 23, 2023, the court denied all three motions. On March 7, 2023, the day before the trial began, Stephens moved to withdraw, stating that Redd had discharged him citing a lack of faith in his trial strategy. The State filed an Emergency Motion for Status of Counsel Hearing and the court held a hearing that same day. The State opposed the motion to withdraw. During the hearing, the court inquired into Redd's complaints about counsel. Redd testified he was dissatisfied with counsel failing to interview the State's witnesses and failing to suppress an interview. The court denied the motion, finding there was not a substantial basis to substitute counsel. The court explained to Redd that Stephens's strategy was "sound" and Stephens had done "an excellent job" arguing his motion during the hearing the day before. The court did not think there was a breakdown in communication, but rather dissatisfaction with the result from the pretrial motions. The trial was held March 8–14, 2023. The jury found Redd guilty of aggravated assault. The District Court sentenced Redd to 20 years at MSP, none suspended.

8

## STANDARD OF REVIEW

¶25 The denial of a motion to dismiss in a criminal case presents a question of law, which we review de novo. *State v. Nickerson*, 2014 MT 83, ¶ 6, 374 Mont. 354, 356, 322 P.3d 421 (internal citations omitted). The underlying findings of fact are reviewed under the clearly erroneous standard. *Nickerson*, ¶ 6 (internal citations omitted).

## DISCUSSION

¶26 *Issue One: Whether the District Court erred in denying Redd's motion to dismiss alleging a violation of the Interstate Agreement on Detainers.*

¶27 In 1970, the United States Congress enacted the Interstate Agreement on Detainers Act (IAD). 18 U.S.C. App. 2 §§ 1–9. At the time of its enactment by the United States, the IAD had already been adopted in 28 states, including Montana. *United States v. Mauro*, 436 U.S. 340, 355, 98 S. Ct. 1834, 1844 (1978). Montana adopted the IAD in 1963. *See* §§ 46-31-101, through -204, MCA. The IAD is a congressionally sanctioned interstate compact enacted under the Compact Clause, Article I, Section 10, Clause 3 of the United States Constitution, is therefore a federal law subject to federal statutory construction. *Nickerson*, ¶ 7.

¶28 Article III of the IAD provides a procedure for a prisoner to settle outstanding detainers by requesting to be brought for trial. Article III is triggered when a "person has entered upon a term of imprisonment," and during the "term of imprisonment," another state[3] lodges a detainer against said person on the basis of "any untried indictment,

---

[3] The IAD defines a "state" to also include the United States, District of Columbia, and Puerto Rico. The United States Supreme Court held the United States is a party to the agreement as both a sending state and receiving state. *Mauro*, 436 U.S. at 354, 98 S. Ct. at 1844.

9

information, or complaint on the basis of which a detainer has been lodged against the prisoner." Section 46-31-101, art. III, § 1, MCA. Once an inmate has been notified of any detainer, the inmate can then deliver a written notice requesting a final disposition be made on the information. Section 46-31-101, art. III, § 1, MCA. The prisoner must make a "written notice and request for a final disposition" and deliver it to the warden, who must then issue a certificate of custody of the prisoner, attach the certificate to the notice, and deliver it to the prosecuting officer. Section 46-31-101, art. III, § 2, MCA. Once the notice is delivered "the prisoner shall be brought to trial within 180 days after the prisoner shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction." Section 46-31-101, art. III, § 1, MCA. Failure to prosecute within 180 days results in a dismissal with prejudice of the underlying indictment; however, the court "may grant any necessary or reasonable continuance." Section 46-31-101, art. III, §§ 1, 4, MCA.

¶29 Separately, Article IV provides a procedure for a county attorney to secure a prisoner's presence for a trial. "The appropriate officer of the jurisdiction in which an untried indictment, information, or complaint is pending shall be entitled to have a prisoner against whom the officer has lodged a detainer and who is serving a term of imprisonment in any party state . . . ." Section 46-31-101, art. IV, § 1, MCA. Once the county attorney lodges a detainer with the sending state's officials, he may then present "a written request for temporary custody or availability" to the sending state. Section 46-31-101, art. IV, § 1, MCA. Upon the prisoner's arrival in the receiving state, "trial shall be commenced within 120 days . . . ." Section 46-31-101, art. IV, § 3, MCA. Just as in Article III, the court may

grant any necessary or reasonable continuance "for good cause shown in open court, the prisoner or the prisoner's counsel being present." Section 46-31-101, art. IV, § 3, MCA.

¶30 Both Articles III and IV require the defendant to be serving a term of imprisonment before the article applies. *See* Section 46-31-101, art. III, § 1, MCA ("a person has entered upon a term of imprisonment in a penal or correctional institution of a party state"); § 46-31-101, art. IV, § 1, MCA ("a prisoner . . . who is serving a term of imprisonment in any party state"). "The Interstate Agreement on Detainers does not apply to a person who is imprisoned awaiting disposition of pending charges and who has not been sentenced to a term of imprisonment." *United States v. Roberts*, 548 F.2d 665, 671 (6th Cir. 1977), *cert. denied*. Because Redd was only awaiting sentencing and was not serving a sentence at the time the court issued a writ of habeas corpus *ad prosequendum*, the IAD would not apply until *after* Redd was sentenced on his federal revocation proceedings.

¶31 The State did not file a detainer while Redd was in federal custody, nor was it required to do so. *State v. Brekke*, 2017 MT 81, ¶ 17, 387 Mont. 218, 392 P.3d 570. Since there was no detainer, the speedy trial provisions of the IAD do not apply, and the case is covered by the common law of speedy trial under the United States and Montana Constitutions.[4]

---

[4] The District Court also held Redd was not yet "available" for the purposes of Article IV(1) until his counsel was appointed. Additionally, the State argues Redd waived his IAD claim by failing to object to the initial trial date. As the IAD does not apply to Redd, we do not address these issues.

¶32    *Issue Two: Whether Redd's initial appearance was held without unnecessary delay.*

¶33    "A person arrested, whether with or without a warrant, must be taken without unnecessary delay before the nearest and most accessible judge for an initial appearance." Section 46-7-101(1) MCA.  Redd was under State custody and therefore arrested beginning on May 20, 2021, pursuant to the State's writ.  He was arraigned four days later.  This raises no concern about unnecessary delay.  Likewise, the time between the State's February 18, 2021 warrant and the May 20, 2021 warrant that was served on Redd is necessary delay because Redd was unavailable for arrest by the State.

¶34    The District Court correctly found that Redd was in federal custody and not accessible to Yellowstone County until May 20, 2021.

¶35    *Issue Three: Whether the District Court erred in denying Redd's motion to dismiss alleging a violation of his right to a speedy trial.*

¶36    Redd argues on appeal that the District Court erred by denying his motion to dismiss for lack of speedy trial claiming that the 613-day delay before trial was mostly attributable to improper conduct by the State.  The State argues it was only responsible for a small portion of the delay, and the rest was due to Redd's own conduct.  The District Court found Redd's bad faith conduct contributed to most of the delay and found no violation of Redd's right to a speedy trial.

¶37    To determine whether there is a violation of a defendant's speedy trial guarantees under the United States and Montana Constitutions, this Court balances the following four factors: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's responses to the delay; and (4) the prejudice to the accused.  *State v. Ariegwe*, 2007 MT 204,

12

¶¶ 106–12, 338 Mont. 442, 167 P.3d 815. No factor alone is dispositive, instead the factors are to be considered together with other relevant circumstances. *Ariegwe*, ¶ 113. Factor One includes two inquiries—whether a speedy trial analysis has been triggered, and the extent the delay extends beyond the trigger date. *Ariegwe*, ¶ 38. If a speedy trial analysis has been triggered under Factor One, the extent of the delay is then weighed alongside the next three factors. *Ariegwe*, ¶ 38. Factor Two looks at each period of delay before trial and attributes the fault of the delay to the appropriate party. *Ariegwe*, ¶¶ 63-64. To protect society's interest in swift prosecutions, the State bears the burden of explaining pretrial delays. *Ariegwe*, ¶ 64. Factor Three is an evaluation of the accused's responses to the delays where the court looks for a genuine desire of the accused to be brought to trial promptly. *Ariegwe*, ¶ 85. Lastly, Factor Four is an inquiry into whether the delay has prejudiced the accused. *Ariegwe*, ¶ 86. All factors are then balanced by the court to determine if the accused's fundamental right to a speedy trial has been violated. We address each factor in turn.

**1. Length of the Delay**

¶38    As a threshold matter under the first factor, the court considers the delay between accusation and trial. *Ariegwe*, ¶ 107. If the pretrial delay is at least 200 days (irrespective of fault for the delay), a speedy trial analysis is triggered. *Ariegwe*, ¶ 107. The court then considers the extent to which the delay exceeds 200 days and balances that consideration among the four factors of the overall balancing test. *Ariegwe*, ¶ 38. Both the presumption

of prejudice against the accused and the State's burden to justify the delay intensify each day beyond the 200-day minimum. *Ariegwe*, ¶ 107.

¶39 Here, both the State and Redd agree the length of the delay is 613 days, from the filing of the Information to the day Redd waived his speedy trial right and retained private counsel. This delay is more than three times the amount of delay sufficient to trigger the speedy trial test. Therefore, the four-factor balancing test was correctly triggered. This delay is significant, requiring the State to provide a compelling justification for the delay.

**2. Reasons for the Delay**

¶40 Under this factor, the district court identifies each period of delay in bringing the accused to trial and then attributes each period of delay to the appropriate party. *Ariegwe*, ¶ 108. "Any delay not demonstrated to have been caused by the accused or affirmatively waived by the accused being attributed to the State by default." *Ariegwe*, ¶ 108. The court assigns weight to each period of delay based on the specific cause and motive for the delay. *Ariegwe*, ¶ 108. If the State has valid reasons for delay, or the delay is attributed to the defendant, the delay is not weighed heavily against the State. *Ariegwe*, ¶ 108.

> **a. motion for leave to file information (February 18, 2021) to transfer Redd into state custody (May 20, 2021)**

¶41 For a total of 91 days, Redd was in federal custody at YCDF awaiting sentencing on his federal probation violation. This Court has found "[d]efendant's imprisonment in another state, based upon defendant's own conduct, should be attributed to him in a speedy trial analysis." *Brekke*, ¶ 15 (citing *State v. Grant*, 227 Mont. 181, 185-86, 738 P.2d 106, 109 (1987)). However, "the time chargeable to an accused held in another state ceases to

14

run when the accused requests final disposition of the Montana charges." *State v. Daly*, 2023 MT 142, ¶ 14, 413 Mont. 100, 533 P.3d 326 (internal citations omitted). Whether time in another jurisdiction's jail or sentence counts against the accused depends on the applicability of the IAD. *Daly*, ¶ 14.

¶42 In *Daly*, a prisoner in Idaho spent 902 days in prison before being released and then arrested in Montana. *Daly*, ¶¶ 2–3. We found the delay unreasonable and credited it towards the State, even though the State never lodged the warrant against the prisoner. *Daly*, ¶¶ 14, 17, 20. Daly's case is distinguishable from Redd's in that the State seemingly abandoned Daly's case for two and a half years after his request to proceed with disposition of his case in Montana. *Daly*, ¶ 18. In that situation, the State could have acted with more diligence and could have brought the prisoner to trial earlier.

¶43 Here, we have already concluded the IAD did not apply to Redd from February 18 to May 20, 2021, because he was waiting to be sentenced in federal court and was not yet serving a sentence. Instead, Redd was turned over to the State on the first day of serving his federal sentence. The State acted as diligently as it could to secure Redd. Because Redd was not yet serving a sentence, the State lacked a mechanism to have Redd secured for trial. Therefore, the *Daly* exception does not apply in this case. The 91 days Redd spent in federal custody awaiting sentencing are attributable to him.

¶44 The District Court attributed the 95 days between February 18, 2021, and May 23, 2021, as institutional delay due to factors inherent in the criminal justice system and caused by circumstances largely beyond the control of the prosecutor and the defendant, citing *State v. Billman*, 2008 MT 326, ¶ 20, 346 Mont. 118, 194 P.3d 58. In doing so, the District

15

Court erred. The delay was not due to a crowded docket or other factors inherent in the justice system. Redd was in the jurisdiction of the federal government based on his own conduct, and therefore, the State was unable to secure Redd for trial. The court erred in attributing this time to the State.

**b. transfer from federal custody (May 20, 2021) to the first scheduled trial date (October 25, 2021)**

¶45 As Redd argues, and the Stated concedes, this period of 158 days is attributable to the State as institutional delay.

**c. delay between first and second trial dates (October 25, 2021, to April 11, 2022)**

¶46 During this period, multiple factors contributed to the delay. The first was the public defender's jurisdictional confusion, which delayed the omnibus hearing until December 1, 2021. Second, the delay was caused by Redd's refusal in holding the omnibus hearing and requesting new counsel. Third, the delay was caused by OPD's difficulty in finding new counsel.

¶47 Delay caused by defendant's motion for new counsel is attributable to the defendant. *State v. Kirn*, 2023 MT 98, ¶¶ 29–30, 412 Mont. 309, 530 P.3d 1; *see also State v. Rose*, 2009 MT 4, ¶ 58, 348 Mont. 291, 202 P.3d 749 (delay caused by a defendant's inconsistent requests for substitution of counsel is attributable to the defendant). In prior cases, we have recognized Supreme Court authority stating, the State may bear responsibility for this delay if it is caused by a "systemic breakdown" in the public defender system. *State v. Redlich*, 2014 MT 55, ¶ 48, 374 Mont. 135, 321 P.3d 82. In *Redlich*, we rejected the notion that

turnover in OPD staff rose to the level of systemic breakdown in the public defender system. *Redlich*, ¶ 48.

¶48    Here, similarly to *Redlich*, there is no evidence there was a breakdown in the system. Delay caused by the public defender's confusion about the State's jurisdiction does not warrant this delay be attributed to the State. Nor do any exceptions to the rule apply in this case. The District Court took great care to make sure conflict counsel was expeditiously appointed, holding multiple hearings to obtain updates from OPD. As OPD represented to the court, "given the nature of the offense and [Redd's] history, [OPD is] struggling to find someone who's able to take [the case] on at this time." After their exhaustive search, OPD was only able to obtain a conflict attorney who resided over 400 miles away. Nothing in the case indicates this delay was caused by a breakdown in the system, versus Redd's request for new counsel, criminal history, and the nature of the offense committed.

¶49    Additionally, while Redd did not affirmatively waive his speedy trial right, he acknowledged there might be significant delay in securing a conflict counsel and accepted this delay would be due to his actions. He also accepted that denial of holding an omnibus hearing on October 15 would delay the proceedings even further. The court informed Redd this delay would likely be attributable to him. This 168-day period of delay is attributable to Redd.

**d. delay from April 11, 2022 trial date to October 24, 2022 trial date**

¶50    Once conflict counsel Gordon was appointed, the court scheduled the soonest trial date possible, April 11, 2022. During the March 17 omnibus hearing, Gordon requested an additional two weeks to file motions, which the court granted. Then two weeks later,

during a trial status hearing on April 1, Gordon requested a continuance so she could file a motion to dismiss due to a violation of the IAD, which was filed on April 7, 2022. The court continued the trial until May 9. During the April 29 status hearing the court delayed the trial by an additional two weeks due to conflict with a different trial. The court then scheduled a motions hearing for May 4, and the trial for May 23. Before the May 4 hearing occurred, Gordon suffered a personal emergency and was unable to attend the hearing or trial. After Gordon confirmed her availability, the court scheduled the motions hearing on July 6, and the trial for October 24, 2022.

¶51 The delay between April 11 and October 24 was attributable to Redd for two reasons: Redd's late motion to dismiss filed on the eve of trial, and the unforeseen emergency which delayed the hearing on the motion until July 6 and delayed the trial until October 24. It is unclear from the record why the court scheduled the trial so far into the future. However, Redd concedes on appeal most of this delay is attributable to him and only disputes the two-week period between May 9 and May 23, which he argues should be attributed to the State as institutional delay.

¶52 "[A]ny delay directly attributable to a motion to dismiss based on denial of speedy trial which is filed less than ten days prior to the commencement of trial will be assigned to the defendant." *Ariegwe*, ¶ 114. Even if the court had to reschedule the trial due to a busy docket, Redd's motion was not fully briefed until July 6 due to Gordon's emergency. The delay of two weeks, between May 9 and May 23, was part of the longer period of

18

delays which were directly attributable to Redd's late filed motion to dismiss.[5] This 196-day delay is attributable to Redd.

¶53 Lastly, as Redd concedes, he waived a speedy trial right due to any delay after October 24, 2022. To sum up, 158 days are attributable to the State, and 455 days are attributable to Redd.

**3. The Accused's Responses to the Delay**

¶54 In evaluating the defendant's responses to the delay in light of the surrounding circumstances, this Court considers: (1) the timeliness, persistence, and sincerity of the objections, (2) reasons for acquiescence, (3) whether the defendant was represented by counsel, and (4) the defendant's pretrial conduct as it bears on the right to a speedy trial. *Ariegwe*, ¶ 113. Conduct which does not evidence a sincere desire to promptly be brought to trial weighs against the defendant in the overall balancing. *Ariegwe*, ¶¶ 81, 85. Examples of such conduct include the filing of frivolous pretrial motions that postponed trial, and tardy assertion by the defendant of the defendant's right to a speedy trial. *Ariegwe*, ¶¶ 81, 85.

¶55 The timing of a defendant's formal assertion of his right to a speedy trial can provide insight into the defendant's desire to be promptly brought to trial. *State v. Houghton*, 2010 MT 145, ¶ 30, 357 Mont. 9, 234 P.3d 904 (holding that the defendant's late assertion of his speedy trial right in conjunction with the defendant's repeated motions to continue

---

[5] Whether attributed to Redd due to his late motion to dismiss or to the State due to institutional delay, this two week period is negligible and does not affect the ultimate resolution of the case.

which omitted articulations of his speedy trial concerns did not evidence a sincere desire for a speedy trial).

¶56 The District Court found this factor to weigh heavily against Redd. The court found:

> While the eve of conduct trial filings, eve of trial seeking new counsel, and bad faith objection to a continuance to hear his own motion to dismiss each individually reflect a lack of desire for a speedy trial, collectively all of this pretrial conduct reflects Defendant's speedy trial assertions are manufactured and made in bad faith and as a whole demonstrate Defendant has not had an actual desire to have this matter brought to trial.

¶57 The District Court correctly found Redd lacked sincerity in his desire for a speedy trial. Despite warnings by the court of their negative impact to trial timeliness, Redd's multiple substitutions of counsel evidence his acceptance of a delayed trial. Redd also failed to request a hearing on his representation despite the court's recommendation. This factor weighs against Redd.

**4. Prejudice to the Accused**

¶58 Under Factor Four, the prejudice to the accused should be assessed considering the following interests of the defendant: "(i) to prevent oppressive pretrial incarceration, (ii) to minimize anxiety and concern of the accused, and (iii) to limit the possibility that the defense will be impaired by dimming memories and loss of exculpatory evidence." *Ariegwe* ¶ 88 (internal citations omitted). The most important of these considerations is the impairment to the defense because fairness is skewed if the accused is unable to adequately prepare for his case. *State v. Spang*, 2007 MT 54, ¶ 12, 336 Mont. 184, 153 P.3d 646 (internal citations omitted).

### a. oppressive pretrial incarceration

¶59 To determine whether the pretrial incarceration was oppressive we must consider the duration of the incarceration, the complexity of the charged offenses, any misconduct related to the pretrial incarceration, and the conditions of the incarceration. *Ariegwe*, ¶ 113. Although Redd was incarcerated for the entirety of the case, "the right to a speedy trial is not intended to prevent all pretrial incarceration. It is designed to prevent oppressive pretrial incarceration." *State v. LaGree*, 2007 MT 65, ¶ 23, 336 Mont. 375, 154 P.3d 615 (citing *State v. Longhorn*, 2002 MT 135, ¶ 36, 310 Mont. 172, 49 P.3d 48). In *State v. Jefferson*, we held that pretrial incarceration did not prejudice the defendant because incarceration was inevitable due to a prior offense. *State v. Jefferson,* 2003 MT 90, ¶ 25, 315 Mont. 146, 69 P.3d 641. Here, Redd's incarceration under federal custody was due to his own probation violation and, therefore, was inevitable.

¶60 Much of the duration of Redd's pretrial incarceration following his release from federal custody was due to Redd's own actions. In addition to the natural complexities of Redd's case mentioned by the District Court, Redd contributed more complexity with frequent counsel turnover. Redd also contends his approximate 20 months in maximum security custody did not have the "normal accommodations which inmates in general population receive." Although the conditions in maximum security may differ from those of the general population, this alone does not demonstrate the incarceration caused him extraordinary prejudice. We conclude that Redd's pretrial incarceration was not oppressive.

21

### b. anxiety and concern

¶61 When considering minimization of anxiety and concern of the accused, we consider if the delay has "unduly prolonged the disruption of his or her life caused by the presence of unresolved criminal charges or aggravated the anxiety and concern that are inherent in being accused of a crime." *Ariegwe* ¶ 113. For the delay to be unduly prolonged, the impact on the accused must rise above that which can be expected from ordinary detainment. *State v. Bullock*, 2017 MT 182, ¶ 25, 388 Mont. 194, 398 P.3d 881. Redd argues he suffered from increased anxiety while incarcerated and was disturbed by an online campaign against him and his family. Redd also claimed that he suffered from "boredom and frustration." "The speedy trial guarantee serves to *shorten* the disruption of life caused by arrest and the presence of unresolved criminal charges, not to eliminate the disruption altogether." *Ariegwe* ¶ 147. (internal citations omitted; internal quotations omitted; emphasis in original). Redd has not demonstrated concerns that exceed the inherent disruptions that accompany a serious criminal offense.

### c. impairment of the defense

¶62 Impairment of the defense requires "affirmative proof that the delay has impaired the accused's ability to present an effective defense," otherwise it is "assessed based on other factors in the analysis." *Ariegwe* ¶ 100. Here, Redd contends he and his counsel could not conduct discovery review due to the restrictions at the detention facility. However, there is no proof that the delay was the cause of this alleged impairment. The District Court correctly found Redd's defense was not impaired.

**d. balancing**

¶63    When assessing a speedy trial claim, a court must balance the four factors together with consideration of relevant circumstances surrounding the case. *Ariegwe*, ¶ 153. Here, Factor One weighs in Redd's favor due to the lengthy delay of 613 days. However, Factor Two weighs heavily in the State's favor, as only 158 days of the 613-day delay is attributed to the State. Factor Three weighs in the State's favor. Redd's insincerity in his desire for a speedy trial is demonstrated through his untimely counsel substitutions and failure to act in furtherance of a speedy trial. Finally, Factor Four also weighs in the State's favor. Redd was responsible for the majority of his pretrial incarceration and suffered no extraordinary anxiety or concern considering the seriousness of his offense. Therefore, balancing the factors with all relevant circumstances, no speedy trial violation occurred.

**CONCLUSION**

¶64    We affirm the District Court.

/S/ CORY J. SWANSON

We Concur:

/S/ KATHERINE M. BIDEGARAY
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ JIM RICE

Justice Katherine Bidegaray, concurring.

¶65    I concur in the Court's decision to affirm Redd's conviction. I write separately to clarify that our speedy-trial jurisprudence must remain a meaningful, independent

23

protection under Article II, Section 24, of the Montana Constitution, rather than a mechanical exercise that risks habitually favoring the State.

## I. Montana Law Governs the Speedy Trial Inquiry

¶66 Montana constitutional law governs the issue of whether Redd's right to a speedy trial was violated. Although this Court's framework in *State v. Ariegwe* is guided by the general approach the United States Supreme Court identified in *Barker v. Wingo*, our test is "grounded in Article II, Section 24 of the Montana Constitution, which provides a speedy trial guarantee that is independent of the Sixth and Fourteenth Amendments to the United States Constitution." *State v. Ariegwe*, 2007 MT 204, ¶ 35, 338 Mont. 442, 167 P.3d 815. As we have long recognized, "the federal constitution establishes the floor and not the apex of constitutional rights." *Ariegwe*, ¶ 35 (quoting *Buckman v. Mont. Deaconess Hosp.*, 224 Mont. 318, 324, 730 P.2d 380, 384 (1986)). Maintaining this distinction is essential to the consistent development of Montana constitutional doctrine and our fidelity to stare decisis.

## II. Application of *Ariegwe* Must Be Faithful to Article II

¶67 I join the Court's application of *Ariegwe* on the specific record before us. However, the balancing process is not a "mechanical" one, *Ariegwe*, ¶ 105, and must be guided by the principle that as the delay increases, so too does the State's burden. Under Factor Two, the State bears the burden to justify pretrial delay, and the further the delay stretches beyond the 200-day trigger date, the heavier is the State's burden to justify the delay. *Ariegwe*, ¶ 62. While "institutional delay" is weighted less heavily than intentional delay, it is still weighted against the State and does not disappear from the balance. *Ariegwe*, ¶ 108. We

24

must be careful not to allow the "institutional" label to become a safe harbor for State inaction as delays lengthen; in cases of extraordinary delay, the State's failure to act must weigh more heavily against it to ensure the constitutional guarantee is not rendered illusory.

¶68 Furthermore, under Factor Four, we must remember that prejudice is not limited to the impairment of a physical defense. Article II, Section 24, protects three independent interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern; and (iii) to limit the possibility that the defense will be impaired . . . ." *Ariegwe*, ¶ 88. These first two interests—preventing oppressive incarceration and minimizing anxiety—assume greater significance as delay lengthens. On a robust record, these interests can establish prejudice even where the defense's ability to present its case is not physically impaired.

### III. Preservation of the Constitutional Standard

¶69 The conclusion the majority reaches in this case rests on the particular balance struck on this record—specifically, the significant delay the defendant caused by frequent counsel substitutions and requests for new counsel. The result reached here does not, and should not, dictate how the balance must be struck in cases involving substantially longer delays, thinner records of State diligence, or more acute evidence of personal prejudice.

¶70 While the result here is defensible given Redd's specific actions, we must remain vigilant to ensure that Article II remains a robust, independent source of protection.

¶71 For these reasons, I concur.

/S/ KATHERINE M. BIDEGARAY